920 F.2d 769
 59 USLW 2496
 INTERSTATE SECURITIES CORPORATION, Plaintiff-Counterclaim
Defendant-Appellee,
v.
HAYES CORPORATION, Roger Haendiges, Defendant-Counterclaim
Plaintiffs-Appellants,
Smith, Barney, Harris, and Uptem & Company, Counterclaim-defendant.
 Nos. 89-3620 & 89-3729.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 7, 1991.
 
 Philip J. Snyderburn, William M. Rishoi, Snyderburn, Rishoi & Swann, Winter Park, Fla., and Arthur R. Louv, Louv & Heinkel, Orlando, Fla., for defendant-counterclaim, plaintiffs-appellants.
 Jacqueline R. Griffin, Peirsol, Boroughs, Grimm, Bennett & Griffin, Orlando, Fla., and Stanley T. Padgett, Marvin E. Barkin, Marie Tomassi, Trenam, Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, Tampa, Fla., for plaintiff-counterclaim, defendant-appellee.
 Appeal from the United States District Court for the Middle District of Florida.
 Before KRAVITCH and ANDERSON, Circuit Judges, and GODBOLD, Senior Circuit Judge.
 ANDERSON, Circuit Judge:
 
 I. BACKGROUND
 
 1
 In September, 1985, Hayes Corporation entered into three contracts with Interstate Securities Corporation, a securities brokerage firm, that enabled Hayes to trade options, commodities and commodities options through an account at Interstate. The agreements also permitted Hayes Corporation to trade securities and write options on margin.[1] Before agreeing to permit Hayes Corporation to trade on margin, Interstate required Roger Haendiges, the president and sole shareholder of Hayes, to execute a written personal guaranty to cover any obligations incurred by the account.
 
 
 2
 In October, 1985, Hayes Corporation began writing uncovered options through its account at Interstate.[2] In March, 1986, Haendiges opened a personal securities trading account at Smith, Barney, Harris & Upton, another brokerage house, and began to write uncovered options in that account as well. On May 19, 1986, Haendiges wrote 1,100 uncovered call options[3] for stock in Reebok International in the Hayes account at Interstate. That same day, Haendiges wrote 1,000 uncovered call options for Reebok stock in his own account at Smith, Barney. When Haendiges attempted to write 1,000 additional put options[4] for Reebok stock[5] in his personal account, Smith Barney refused to permit Haendiges to add to his position without investing an additional $500,000 in cash. Unwilling to provide that money, Haendiges asked Interstate if it would accept his personal account from Smith, Barney and combine it with the Hayes account. Despite the large and highly speculative position of Haendiges's account, Interstate accepted the account on May 23, 1986, on the condition that Haendiges reduce his exposure and execute additional promissory notes pledging his personal property to cover any shortfall.
 
 
 3
 On Friday, May 30, 1986, executives from Interstate met with Haendiges in Orlando, Florida to discuss strategies for reducing the risk in the Hayes account. Interstate informed Haendiges that if he failed to meet a future margin call,[6] his account would be liquidated within twenty-four hours. At the close of business on that day, the Hayes account had a positive liquidation value between $1,800,000 and $2,000,000.
 
 
 4
 On Monday, June 2, 1986, the first day of trading following the May 30 meeting, the price of Reebok stock rose quickly, and the equity in the Hayes account was rapidly depleted.[7] In response, Interstate issued a margin call to Hayes Corporation for $217,522.00. From June 2 until July 18, Interstate issued numerous margin calls for various amounts in response to the changes taking place in the account. Despite the issuance of these additional margin calls, Haendiges did not deposit any additional funds into the Hayes account, except for a $5,000.00 good faith deposit.
 
 
 5
 The parties dispute whether Haendiges asked Interstate not to liquidate the account. Interstate argues that Haendiges "repeatedly urged Interstate not to liquidate the Hayes account." Appellee's brief at 8. Haendiges denies that he ever asked Interstate to keep the account open and contends that Interstate improperly assumed control of his account as of June 2, 1986, and that he fully expected Interstate to liquidate the account at that time. In any event, on July 18, 1986, forty-nine days after the initial margin call, Interstate elected to liquidate the Hayes account. At the time of liquidation, the account had a debit balance of approximately $1,800,000.00.
 
 II. PROCEDURAL HISTORY
 
 6
 In August, 1986, Interstate filed suit against Hayes Corporation to recover $1,867,061.00, the amount allegedly owed to Interstate following the liquidation of Hayes' account. Interstate also sued Haendiges as the guarantor of that account. In addition, Interstate claimed that Hayes Corporation and Haendiges made fraudulent misrepresentations that induced Interstate to accept the transfer of Haendiges' personal account from Smith, Barney and to permit the Hayes account at Interstate to remain open after its liquidation value was insufficient to cover its margin.
 
 
 7
 Hayes Corporation and Haendiges asserted numerous counterclaims against Interstate, including breach of contract, breach of fiduciary duty, and negligent handling of accounts. In addition, appellants alleged that Interstate had violated Regulation T, the federal regulation governing the issuance of credit by securities firms to investors who trade securities on margin.[8]
 
 
 8
 It is not clear from the record what happened to the breach of contract claim, but Hayes Corporation and Haendiges did not raise it in the pretrial stipulation and apparently did not pursue it at trial. Prior to the commencement of trial and during the trial, the district court ruled that evidence of violations of Regulation T was irrelevant and therefore inadmissible. At the close of the trial, the district court ruled that the Florida Supreme Court's decision in AFM Corporation v. Southern Bell Telephone and Telegraph Co., 515 So.2d 180 (Fla.1987), indicated that, as a matter of law, Hayes Corporation's and Haendiges's counterclaim of negligence could not go forward. Thus, breach of fiduciary duty was the only issue that reached the jury.
 
 
 9
 At the close of evidence, the district court instructed the jury regarding the breach of fiduciary duty claims. During jury deliberations, the jury submitted these questions to the court:
 
 
 10
 If it is a federal regulation that an account must be closed immediately, why was the account left open until 23 July, 1986 with marginal [sic] calls coming in almost daily? End of question. And, does this affect the fiduciary relationship?
 
 
 11
 R11-555. Counsel for Hayes Corporation and Haendiges suggested to the court that perhaps the jury was referring to regulation T, which requires accounts to be liquidated within seven days after an investor fails to meet a margin call.[9] See 12 C.F.R. 220.4 (1988). Counsel for Interstate argued that there was no requirement that an account must be liquidated "immediately" so that the answer to the first question must be that no such regulation exists. The court agreed that there was no regulation that required "immediate" liquidation and ultimately issued the following answer to the jury's questions:
 
 
 12
 There was no federal regulation requiring the account to be closed immediately. As to why the account was left open so long with marginal (adopting the jury's language) calls coming almost daily, that is something which you, the jury, must determine from the evidence before you. In determining any issue, you should consider all the evidence before you.
 
 
 13
 R11-560. (parenthetical added).
 
 
 14
 The jury returned a verdict in favor of Interstate for the balance due on the liquidated account and rejected Hayes Corporation's and Haendiges's counterclaims that Interstate had breached its fiduciary duty. The district court later granted Interstate's motion for interest and attorneys' fees, so that a final judgment was entered in favor of Interstate in the amount of $2,883,886.95. It is from that judgment that Hayes Corporation and Haendiges appeal.
 
 III. ISSUES ON APPEAL
 
 15
 Two primary issues are raised in this appeal. First, whether the district court properly applied the holding in AFM Corp. v. Southern Bell Telephone & Telegraph Co., 515 So.2d 180 (Fla.1987), to determine, as a matter of law, that Hayes Corporation and Haendiges cannot sue Interstate for negligence. Second, whether the district court erred in ruling that evidence of violations of regulation T is irrelevant and inadmissible and in failing to instruct the jury regarding regulation T in response to jury questions during deliberations.
 
 
 16
 We affirm the district court's holding that the AFM doctrine bars Hayes Corporation's and Haendiges's negligence claims. We further hold that AFM also bars the claims regarding breach of fiduciary duty. Because we find that, as a matter of law, the breach of fiduciary duty claim should not have been submitted to the jury, the regulation T issues are rendered moot.
 
 IV. DISCUSSION
 
 17
 In AFM Corp. v. Southern Bell Telephone & Telegraph Co., 515 So.2d 180 (Fla.1987), the Florida Supreme Court held that without evidence of personal injury or property damage, a plaintiff cannot raise tort claims to recover solely economic damages flowing from a breach of contract. The court determined that parties to a contract can only seek tort damages if conduct occurs that establishes a "tort 'distinguishable from or independent of [the] breach of contract.' " Id. at 181 (citing Lewis v. Guthartz, 428 So.2d 222, 224 (Fla.1982)).
 
 
 18
 In AFM, AFM Corporation entered into an agreement with Southern Bell that would place AFM's advertisement and phone number in the Southern Bell yellow pages. See id. at 180. AFM later moved its offices and changed its phone number, and the parties agreed to employ a referral service to help prospective customers contact AFM's new offices. Id. When the new yellow pages were distributed, Southern Bell listed AFM's old number in its advertisement. Id. In addition, Southern Bell had assigned AFM's old number to a new customer and discontinued the referral service. Id. As a result, potential customers could not contact AFM. When AFM discovered the error, Southern Bell reinstated the referral service but later mistakenly disconnected it again. Id. at 181. AFM sued Southern Bell in both contract and tort to recover lost profits due to the loss of prospective customers. See AFM Corp. v. Southern Bell Telephone and Telegraph Co., 796 F.2d 1467, 1468 (11th Cir.1986). AFM presented evidence that it had suffered damages in the amount of $21,800.00. Id. At the close of evidence, AFM withdrew its contract claims and relied solely on its tort theories of recovery. The jury returned a verdict in favor of AFM and awarded both compensatory and punitive damages. Id.
 
 
 19
 On appeal, the United States Court of Appeals for the Eleventh Circuit determined that Florida law was unclear as to whether AFM, as a party to a contract, could recover its lost profits under a tort theory and as to whether punitive damages could be recovered by one party to a contract from another. The Eleventh Circuit certified those issues to the Florida Supreme Court, which combined and restated the questions as a single issue: "Does Florida permit a purchaser of services to recover economic losses in tort without a claim for personal injury or property damage?" See AFM Corp. v. Southern Bell Telephone and Telegraph Co., 515 So.2d 180, 180 (Fla.1987).
 
 
 20
 In answering "no" to that question, the Florida Supreme Court relied heavily on its decision in Florida Power & Light Co. v. Westinghouse Elec. Corp., 510 So.2d 899 (Fla.1987). In Florida Power, the Florida Supreme Court determined that a purchaser of goods could not seek damages in tort for the failed performance of a product in the absence of personal injury or damage to property other than the allegedly defective goods. The court reasoned that to permit tort recovery between parties to a contract in the absence of personal injury or damage to property outside the contract would disturb the allocation of risks negotiated or at least agreed upon by the parties. Id. at 901. In cases involving the purchase of goods, the court held that while manufacturers and sellers have a duty to market products that do not create unreasonable danger to persons and property, they cannot be charged with the risk that their products will not meet the economic expectations of customers unless they have expressly agreed to accept that risk. Id. at 900-01. As a result, the Florida Power court held that principles of contract and warranty law are better suited than those of tort law to protect parties to a contract from purely economic loss. See id. at 900.
 
 
 21
 The AFM court noted that the contract in Florida Power involved the sale of goods while the contract between Southern Bell and AFM involved the sale of services, but concluded that AFM's tort claims were limited by the same principles. See id. at 181. The court held that AFM, like the plaintiff in Florida Power, was attempting to recover solely economic damages under tort theory for a negligent breach of contract. See id. The court stated that under Florida law, even the most flagrant and unjustifiable breach of contract does not warrant tort damages unless that breach is accompanied by behavior that " 'amounts to an independent tort.' " Id. (quoting Electronic Sec. Sys. Corp. v. Southern Bell Telephone & Telegraph Co., 482 So.2d 518, 519 (Fla.Dist.Ct.App.1986)). The court found that AFM had failed to prove the existence of a tort independent of the breach of contract, and therefore could not recover economic damages from Southern Bell under a tort theory.
 
 
 22
 a. Negligence Claims
 
 
 23
 Appellants concede that because they entered into a contract with Interstate, they cannot recover damages in tort unless they meet the exceptions in the AFM decision. Appellants contend that they meet those exceptions for two reasons: (1) they are seeking recovery for injury to "property" rather than solely economic losses; and (2) Interstate's behavior constitutes a tort separate and independent from any alleged breach of contract. Because these issues implicate questions of Florida law, we review the district court's ruling de novo.
 
 
 24
 Appellants argue that they are entitled to tort recovery because the loss in value of the securities in the Hayes account represents an injury to their "property," and does not represent solely economic loss. They attempt to distinguish their situation from that in AFM on the grounds that AFM was seeking lost profits while they are merely seeking the actual value of their trading account on the day that Interstate allegedly had a duty to liquidate it.
 
 
 25
 This argument is fundamentally flawed because it ignores the policies underlying the AFM decision. Although the AFM opinion concluded that "conduct resulting in ... property damage" would be sufficient to warrant a recovery in tort, see AFM, 515 So.2d at 181, other decisions clarify that the injured property must be outside the scope of the contract between the parties.
 
 
 26
 In East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the United States Supreme Court held that a manufacturer has no tort-based duty to "prevent a product from injuring itself" and that "[d]amage to a product itself is most naturally understood as a warranty claim." See id. 106 S.Ct. at 2302, 2303 (footnotes and citations omitted).
 
 
 27
 In Florida Power, the Florida Supreme Court adopted the reasoning in East River to hold that the plaintiff could not recover for the failed performance of defendant's steam generators because the appropriate remedies for such failures, in the absence of personal or property injury, were provided by contract and warranty law. See Florida Power, 510 So.2d at 901. The court's discussion of the available warranty remedies emphasized that tort recovery would not be available unless damage occurred to property that was not recoverable under contract or warranty law. See id. at 902. Other decisions under Florida law clarify that tort damages are not available unless the plaintiff has suffered injury to property outside the scope of the contract between the parties. See Strickland-Collins Constr. v. Barnett Bank, 545 So.2d 476, 477 (Fla.Dist.Ct.App.1989) (citing Florida Power and AFM to hold that no tort claims are available "[i]n the absence of personal injuries or property damages outside the contract "); Belle Plaza Condominium Assoc. v. B.C.E. Dev., Inc., 543 So.2d 239, 240-41 (Fla.Dist.Ct.App.1989) (citing AFM in denial of tort damages where "no damages were sought for ... damage to property other than the defective property itself " ); GAF Corp. v. Zack Co., 445 So.2d 350, 351-52 (Fla.Dist.Ct.App.1984) (prohibiting tort damages because plaintiff suffered no additional property injury due to negligently manufactured and installed roofing materials).
 
 
 28
 Appellants' alleged injury is not an injury to "property" within the meaning of AFM. The Hayes account, the allegedly damaged property in this case, was the primary subject of the contract between appellants and Interstate. All agreements between the parties in this case governed their relationship with respect to the management of that account and the allocation of risks in the event of losses. Consequently, the diminution in value of the Hayes account was not damage to property outside the scope of the contract between the parties and, therefore, did not constitute damage to "property" under AFM that would permit the appellants to recover in tort.[10]
 
 
 29
 Hayes Corporation and Haendiges also appear to argue that Interstate committed an independent tort in failing to act non-negligently in the management of the Hayes account. Appellants urge that Florida law imposes a duty upon brokers to act non-negligently in the handling of customer accounts and that Interstate breached that duty in a number of ways, including making investment decisions in the Hayes account that increased its losses.
 
 
 30
 We affirm the district court's refusal to submit the appellants' negligence claims to the jury. Appellants essentially claim that Interstate negligently mishandled the Hayes account, the remedies for which were negotiated or at least agreed upon by the parties in the various customer agreements. Florida law is clear that claims for negligent breach of contract are foreclosed under AFM. See e.g., Strickland-Collins Constr. v. Barnett Bank, 545 So.2d 476, 477-78 (Fla.Dist.Ct.App.1989). Indeed, prohibiting claims for negligent breach of contract preserves the essential distinction between contract and tort law and is the fundamental premise of the AFM doctrine. See id. To permit the recovery of tort damages in this case would disturb the agreement signed by the parties, blur the distinction between contract and tort, and conflict fundamentally with the AFM decision.
 
 
 31
 b. Fiduciary Duty Claim
 
 
 32
 In addition to their negligence claims, appellants asserted a claim that Interstate breached a fiduciary duty. Appellants argue that Florida law imposes a duty of utmost good faith as well as a fiduciary duty upon all securities brokers in their dealings with investors. Appellants argue that Interstate breached its duty to deal with them in the utmost good faith. Appellants also argue that Interstate breached its fiduciary duty by failing to liquidate the account promptly, by taking control of the account prematurely, and by opening new positions in the account that resulted in additional losses for appellants. Because a broker's duties of utmost good faith and fiduciary responsibility arise not from a contract but from Florida common law, appellants conclude that their allegations of negligence constitute torts separate and independent from Interstate's alleged breach of contract and therefore should have been submitted to the jury under AFM.
 
 
 33
 Because no personal injury or property damage occurred in this case, the issue is whether, as a matter of Florida law, breach of fiduciary duty is the kind of tort that is foreclosed between parties to a contract under AFM or whether it constitutes a tort separate and independent from an accompanying breach of contract.[11] We located no Florida state court cases that address the application of AFM to a claim for breach of fiduciary duty. But see Bankest Imports, Inc. v. ISCA Corp., 717 F.Supp. 1537, 1540-41 (D.Fla.1989) (dismissing negligence claims under AFM but remanding breach of fiduciary duty claim with leave to amend). Appellants conceded at oral argument, however, that if the AFM doctrine bars the negligence claims in this case, it would also bar the fiduciary duty claim. We examined all of the Florida cases that have applied AFM to other tort claims. That research disclosed a case, J. Batten Corp. v. Oakridge Inv. 85, Ltd., 546 So.2d 68 (Fla.Dist.Ct.App.1989), which indicates that the instant fiduciary duty claim is barred.
 
 
 34
 In J. Batten, a general contractor sued the property owner in a construction project under a mechanic's lien and asserted additional claims for breach of contract and fraud. Id. at 68-69. The trial court dismissed the contractor's fraud claims under AFM. Id. at 69. On appeal, the Florida District Court of Appeals affirmed the dismissal of the fraud claim, citing AFM, 515 So.2d 180; Lewis v. Guthartz, 428 So.2d 222 (Fla.1982); and John Brown Automation, Inc., v. Nobles, 537 So.2d 614 (Fla.Dist.Ct.App.1989).
 
 
 35
 If Florida courts dismiss fraud claims between parties to a contract under AFM, it is probable that the Florida courts would also dismiss fiduciary duty claims. Appellants' claim for breach of fiduciary duty is based upon a duty allegedly imposed upon securities brokers by Florida law when they enter into a contract with an investor. The relationship does not arise unless the parties have entered into a contract involving the trade of securities. A plaintiff need not prove any affirmative action by the defendant in order to establish a breach of fiduciary duty, only that the duty was breached by improper action or by the failure to take necessary action.
 
 
 36
 A fraud claim is based upon a general duty of good faith and fair dealing that pervades all commercial dealings, regardless of the existence of a contract. In addition, the plaintiff in a fraud claim must prove that the defendant engaged in affirmatively fraudulent conduct.
 
 
 37
 In our judgment, a fraud claim, which is no way dependent upon a contract and inherently requires affirmative fraudulent conduct by the defendant, is much more likely to constitute a separate and independent tort under Florida law than is a claim for breach of fiduciary duty, which is dependent upon the existence of a contract. Consequently, we hold that if a fraud claim is foreclosed as a matter of Florida law under the AFM doctrine, a claim for breach of fiduciary duty must be prohibited as well. Therefore, appellants' claim for breach of fiduciary duty should have been dismissed under the AFM doctrine and the district court erred in submitting that claim to the jury.
 
 
 38
 This decision does not conflict with those Florida cases in which tort claims have been permitted. In the cases permitting tort recovery for economic damages, the plaintiff had no alternative means of recovery. See Pinnacle Port Community Ass'n, Inc. v. Orenstein, 872 F.2d 1536, 1545-56 (11th Cir.1989) (permitting community association to sue lender for negligence in spite of existence of contract between them because lender had undertaken to perform repairs gratuitously, had performed the work negligently, and the association had no contractual remedy); A.R. Moyer, Inc. v. Graham, 285 So.2d 397, 482 (Fla.1973) (permitting general contractor to recover tort damages from an architect for negligent supervision of a project because the contractor had no contract with the architect, had suffered actual financial injuries due to the architect's negligence, and had no other remedy); Latite Roofing Co. v. Urbanek, 528 So.2d 1381, 1383 (Fla.Dist.Ct.App.1988) (holding that the prohibition of tort claims under AFM and Florida Power does not apply unless "there are alternative theories of recovery better suited to compensate the damaged party for a peculiar kind of loss").
 
 
 39
 In the instant case, the plaintiffs/appellants entered into a contract with the defendant, alleged that the defendant breached that contract, and apparently abandoned the breach of contract claim. The fact that Hayes Corporation and Haendiges possessed an alternative means of recovery[12] distinguishes this case from those cases that have allowed tort recovery for purely economic losses and places it squarely within the AFM doctrine.
 
 
 40
 Because we conclude that the breach of fiduciary duty claim should not have been submitted to the jury under Florida law, appellants' assertions of error regarding that claim are rendered moot.
 
 
 41
 For the foregoing reasons,[13] the judgment of the district court is
 
 
 42
 AFFIRMED.
 
 
 
 [1]
 Trading securities on margin means that an investor only pays a portion of the price of a security and borrows the remainder from his broker. Federal regulations specify the extent to which and under what conditions a broker may extend credit to an investor for investment purposes. See 12 C.F.R. 220.4, 220.5 & 220.18 (1988)
 
 
 [2]
 In Miller v. Prudential Bache Securities, Inc., 884 F.2d 128 (4th Cir.1989), the Fourth Circuit provided a simplified explanation of uncovered option writing:
 In a naked option transaction, one party sells to another options contracts, granting the buyer the right to purchase a particular stock at a price lower than the current trading price of that security. The seller of the option, however, does not own the underlying stock. Therefore, if the purchasing party elects to exercise his option, the seller is required to purchase the stock, usually at a higher price than the optionee is required to pay.
 Id. at 129 n. 1.
 
 
 [3]
 A call option is a contract under which one party purchases the right to buy stock at a specified price at or within a specified time from another party
 
 
 [4]
 A put option is a contract in which one party buys the right to sell particular securities at a specified price at or within a specified time to another party
 
 
 [5]
 Haendiges's effort to write both call and put options for the same stock, that of Reebok in this case, was consistent with his option trading strategy, which was called "combination writing" or "bracketing." Appellant's brief at 8. Under that strategy, Haendiges sold an equal number of put and call options for the same stock. See R10-193-361. For example, if a stock was trading at fifty dollars, Haendiges would sell someone the right to buy the stock for fifty-five dollars and sell someone else the right to sell the stock for forty-five dollars. See id. at 361-66. Haendiges's strategy was to select stocks that he felt were going to experience very little change in price, sell both call and put options, and then hope that the stock's price would not change enough to make either the call or put options profitable to exercise. Id. If that happened, he collected money for the options and got to keep the money if the options were never exercised. See id. at 358-59, 361-62. Of course, his strategy became much more complicated as the price of the stock changed, see id. at 361-66, but this explanation provides a basic understanding of combination writing
 
 
 [6]
 A margin call is a demand by a broker that an investor deposit "additional cash or securities to eliminate or reduce a margin deficiency." 12 C.F.R. 220.2(1) (1988). A "margin deficiency" occurs when the equity in an investor's account is less than that required by law to support the account's liabilities. 12 C.F.R. 220.2(m) (1988)
 
 
 [7]
 In accordance with his strategy of combination writing, see supra note 5, Haendiges had sold options that required him to sell Reebok stock at a certain price. At the time he sold those options, the trading price of Reebok stock was lower than the option price. On June 2, 1986, the price of Reebok stock rose above the price at which Haendiges had agreed to sell it under the option agreement. As a result, Haendiges was forced to sell Reebok stock at the option price
 Haendiges's problems were exacerbated by the fact that he did not own the stock he had agreed to sell. In order to satisfy his obligations under the options, Haendiges had to purchase Reebok stock at its current market price and then resell it immediately at the option price. Because the option price was lower than the current market price, the Hayes account lost money on every share of stock that Haendiges purchased and resold. These events, combined with the large size of Haendiges's Reebok position, produced large losses in the Hayes account in a very short period of time.
 
 
 [8]
 Regulation T provides that when an investment firm issues a margin call on an account and the investor fails to provide the requested capital, the investment firm must liquidate the account within seven days of the margin call unless certain exceptions are met. Hayes and Haendiges allege that by keeping the account open for over fifty days after the first margin call, Interstate violated regulation T
 Regulation T also provides that when an investment account does not meet certain margin requirements, investment firms may not open new positions in the account. Hayes and Haendiges assert that Interstate's efforts to recoup the Hayes account's losses after it took control of the account resulted in Interstate's improperly opening new positions in a defaulted account.
 
 
 [9]
 Despite the earlier ruling suppressing evidence regarding regulation T, the jury apparently heard testimony on that subject without objection by Interstate
 
 
 [10]
 Because we find that the AFM decision only permits tort claims if there has been damage to property outside the parties' contract, we do not address the issue of whether the diminution in the value of appellants' securities constitutes damaged "property" rather than solely economic loss under AFM
 
 
 [11]
 As discussed above, Florida law clearly prohibits claims for negligent breach of contract. See e.g., AFM, 515 So.2d at 181-82. Although we located no Florida cases that describe what kinds of torts would be separate and independent from a breach of contract, it seems reasonable that under appropriate facts, tort damages might be available for defamation, for example, in addition to the remedies for an accompanying breach of contract. Within those broad parameters, however, little Florida law is available involving the application of AFM to torts more closely related to breach of contract
 In addition, it is unclear under AFM what is required to prove a separate and independent tort. The opinion does not explain whether the plaintiff need merely show that the same actions which resulted in a contractual breach also fulfilled the elements of a tort claim or whether the plaintiff must establish additional behavior by the defendant beyond that which breached the contract that supports a tort claim.
 We do not, however, need to address those issues in order to resolve the instant case.
 
 
 [12]
 One of the central tenets of the AFM doctrine is that the parties have negotiated or at least agreed to execute a contract that allocates various risks among them. The AFM doctrine recognizes that to permit one party to a contract to recover tort damages from another for breach of the agreement defeats one of the agreement's chief purposes--the allocation of risks among the parties
 
 
 [13]
 Appellants other claims on appeal are without merit and warrant no relief