955 F.2d 1467
 BankATLANTIC, a federal savings bank, f/k/a Atlantic Federal
Savings and Loan Association of Ft. Lauderdale,
Plaintiff-Counterclaim Defendant-Appellee,
v.
BLYTHE EASTMAN PAINE WEBBER, INC., Defendant-Counterclaim
Plaintiff-Appellant.
BankATLANTIC, A Federal Savings Bank f/k/a Atlantic Federal
Savings & Loan Association of Ft. Lauderdale,
Plaintiff-Appellant,
v.
BLYTHE EASTMAN PAINE WEBBER, INC., n/k/a Painewebber,
Defendant-Appellee.
BankATLANTIC, A Federal Savings Bank f/k/a Atlantic Federal
Savings & Loan Association of Ft. Lauderdale,
Plaintiffs-Appellees,
v.
BLYTHE EASTMAN PAINE WEBBER, INC., Defendant-Appellant.
 Nos. 90-5142, 90-5162, 90-5776 and 90-5979.
 United States Court of Appeals,
Eleventh Circuit.
 March 23, 1992.
 
 1
 John H. Schulte, Paul McMahon, Jorden, Schulte & Burchette, Miami, Fla., for Blythe Eastman Paine Webber, Inc.
 
 
 2
 Eugene E. Stearns, Bradford Swing, Miami, Fla., for Bankatlantic.
 
 
 3
 Appeals from the United States District Court for the Southern District of Florida.
 
 
 4
 Before EDMONDSON and DUBINA, Circuit Judges, and ATKINS*, Senior District Judge.
 
 ATKINS, Senior District Judge:
 
 5
 BankAtlantic appeals from a judgment entered on a jury verdict and from denial of two post-trial motions relating to juror misconduct. Blythe Eastman Paine Webber Inc., n/k/a PaineWebber Inc. ("PaineWebber"), appeals from a judgment on the pleadings entered against it on its counterclaim and from denial of its motion for sanctions and attorney's fees. We find sufficient evidence to sustain the jury's verdict, no abuse of discretion in the denial of BankAtlantic's motions for new trial, 130 F.R.D. 153, and PaineWebber's motion for sanctions, and no error in granting judgment on the pleadings in favor of BankAtlantic on PaineWebber's counterclaim. Accordingly, we AFFIRM.
 
 A. BACKGROUND
 
 6
 BankAtlantic is a federally chartered savings and loan institution. At the time of this litigation, it was one of the largest savings and loan institutions in Florida and in the United States. In 1984, BankAtlantic retained PaineWebber as a financial advisor to assist it in blocking several hostile takeover attempts. PaineWebber also served as a broker in two transactions known as interest rate swaps.[1] Based on PaineWebber's recommendation, BankAtlantic entered into the two interest rate swaps with Homestead Savings ("Homestead") in an effort to hedge its adjustable rate deposit payables against an increase in interest rates. Alleging non-performance under the agreement, BankAtlantic terminated the services of PaineWebber as financial advisor and employed another firm to assist with the interest rate swaps. During this time, interest rates were falling drastically, allegedly causing BankAtlantic to suffer losses in excess of $30 million.
 
 
 7
 In August 1987, BankAtlantic brought suit against PaineWebber alleging these losses were caused by PaineWebber's failure to disclose the risks involved in interest rate swaps, e.g., that if interest rates fell, the high yielding fixed rate mortgages would be prepaid as borrowers refinanced. BankAtlantic also alleged that PaineWebber failed to disclose its extensive relationship with Homestead, that Homestead was not creditworthy and therefore that BankAtlantic should have obtained collateral from Homestead. The complaint alleged breach of contract,[2] breach of fiduciary duty, fraud, fraudulent concealment, negligence, and negligent misrepresentation.
 
 
 8
 PaineWebber served an answer denying liability and filed a counterclaim for recovery of fees and costs on the theory that it was entitled to indemnification under the terms of the agreement between the parties. The district court granted judgment on the pleadings in favor of BankAtlantic as to the counterclaim. On November 13, 1989, after a five-week trial, the jury returned a verdict in favor of PaineWebber.
 
 
 9
 In February 1990, BankAtlantic appealed the final judgment in favor of PaineWebber; PaineWebber appealed from the final judgment against it on the counterclaim. Around this same time, BankAtlantic filed a motion for a new trial based upon newly discovered evidence that one of the jurors had read a newspaper article about BankAtlantic during the trial. The district court requested that the appeals be stayed and ordered an evidentiary hearing on the matter, which included an in camera interview of the jurors. On April 16, 1990, BankAtlantic filed a supplemental motion for new trial claiming that two of the jurors failed to give correct responses on voir dire. The district court denied both motions. BankAtlantic appealed that order, which was consolidated with the two previous appeals.[3]
 
 
 10
 On October 11, 1990, PaineWebber filed a motion for sanctions and attorney's fees, arguing that BankAtlantic's suit was frivolous because it suffered no injury or loss and because BankAtlantic was fully aware of how interest rates fluctuate and mortgages function. The district court denied PaineWebber's motion and PaineWebber appealed.
 
 B. DISCUSSION
 
 11
 1. The Motion for Judgment Notwithstanding the Verdict or
 
 
 12
 for a New Trial
 
 
 13
 A court reviewing an order denying a motion for entry of judgment notwithstanding the verdict applies the same standard used by a district court when considering motions for directed verdict or for j.n.o.v. The Eleventh Circuit has set forth the standard in detail:
 
 
 14
 If the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied and the case submitted to the jury. A mere scintilla of evidence is insufficient to present to the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict of substantial evidence to create a jury question.
 
 
 15
 Von Stein v. Brescher, 904 F.2d 572, 578 (11th Cir.1990) (quoting Boeing Company v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc). A court determining whether the record contains substantial evidence supporting the jury verdict must view the evidence, and all logical inferences therefrom, in the light most favorable to the appellee. Smith v. PAPP Clinic, P.A., 808 F.2d 1449, 1452 (11th Cir.1987).
 
 
 16
 BankAtlantic advances several grounds in support of its argument that the district court erred in denying its motion for judgment notwithstanding the verdict or for a new trial. First, PaineWebber had a fiduciary duty pursuant to the financial advisory agreement it entered with BankAtlantic. Second, despite the duty it owed to BankAtlantic, PaineWebber did not disclose the risks associated with interest rate swaps. Third, PaineWebber failed to disclose either its relationship with Homestead--the counterparty to the swaps--or Homestead's financial problems. Fourth, it was undisputed that BankAtlantic's loss occurred because of PaineWebber's concealment of the risks from BankAtlantic. In sum, BankAtlantic contends that the jury's verdict was contrary to the substantial evidence presented at trial regarding PaineWebber's breach of fiduciary duty, negligence and fraud.
 
 
 17
 Having reviewed the voluminous record in the appropriate light, we determine the record contains substantial evidence to support the jury's verdict. The evidence showed that BankAtlantic was aware of the risks associated with the interest rate swaps, such as rate fluctuations and prepayment of mortgages. Indeed, Donald Streeter, the president and chairman of BankAtlantic, testified that he and Gerald Roberts, BankAtlantic's senior vice-president, had discussed the interest rate swaps. In addition, the record shows that in January 1984 PaineWebber made a full presentation to BankAtlantic's board of directors, which included a discussion of the effect of rising and falling interest rates.
 
 
 18
 The record also contains substantial evidence that BankAtlantic knew of PaineWebber's relationship with Homestead. Mr. Streeter indicated that he was aware that PaineWebber had recently brokered a $125 million CD offering for Homestead and that he knew that it was common for a broker to match its customers in a transaction. There also was evidence to refute the claim that Homestead was not creditworthy and that PaineWebber should have advised BankAtlantic to obtain collateral from Homestead. Lawrence Weissberg, Homestead's chairman of the board, testified that Homestead had been in business for over a century and that it continued to be profitable throughout the 1980s. Jim Hunter, BankAtlantic's chief investment officer, and Walid Chammah of PaineWebber, testified that it was BankAtlantic that refused to enter into a collateralized swap with Homestead. Mr. Streeter testified that no one at BankAtlantic felt the need for collateral.
 
 
 19
 Finding substantial evidence to support the jury's verdict, we conclude that the district court did not err in denying BankAtlantic's motion.
 
 
 20
 2. The Motions for New Trial Based on Alleged Juror Misconduct
 
 
 21
 After filing its appeal of the final judgment, BankAtlantic filed two additional motions for new trial based on newly discovered evidence relating to alleged juror misconduct. The first of these recited that jury foreman Anthony Lippert had read, in violation of an express court order, an article that containing extraneous information about BankAtlantic and its chairman, Alan Levan. The article included a discussion of Mr. Levan's income in the context of BankAtlantic's poor earnings. The article also contained information on BankAtlantic's litigation with a minority shareholder which had been excluded as evidence from trial.
 
 
 22
 The second motion was based on alleged false responses by two members of the jury panel. Specifically, BankAtlantic alleged that Anthony Lippert concealed that he was a real estate salesman employed by a law school classmate of one of PaineWebber's trial counsel, and that John Chanquet concealed that several criminal convictions and a civil judgment had been entered against him. As noted, the district court held an evidentiary hearing and thereafter denied both motions.
 
 
 23
 (a) Juror Exposure to Extrinsic Evidence
 
 
 24
 A juror's consideration of extrinsic evidence requires a new trial "if the evidence poses a reasonable possibility of prejudice to the defendant." United States v. Rowe, 906 F.2d 654, 656 (11th Cir.1990) (quoting United States v. Perkins, 748 F.2d 1519, 1533 (11th Cir.1984)). The defendant must first establish prejudice by a preponderance of credible evidence. If and when a defendant makes this showing, the burden shifts to the plaintiff to prove that the juror's consideration of the extrinsic evidence was harmless. Id. at 657. The factual determination of whether consideration of extrinsic evidence caused the defendant prejudice is committed to the trial court's "large discretion." Id. (quoting Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959)).
 
 
 25
 This court previously considered a motion for a new trial based on a jury's exposure to a newspaper article in United States v. Bolinger, 837 F.2d 436 (11th Cir.), cert. denied, 486 U.S. 1009, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988). After the jury returned a verdict of guilty on drug possession and distribution charges, the defendants learned that one juror had read a newspaper article containing information that had been suppressed as evidence by the trial judge. Id. at 440. One juror overheard another's comments regarding the substance of the article, specifically that a raid on the defendant's home had uncovered several hundred thousand dollars in a mattress. The other jurors heard only references to the article itself. Id.
 
 
 26
 Despite the inflammatory nature of the information reported in the article, the Eleventh Circuit concluded that the evidence against the defendant was so overwhelming that the introduction of the extrinsic evidence could not have been prejudicial. Id. The court distinguished United States v. Williams, 568 F.2d 464 (5th Cir.1978), which involved several jurors' hearing a television news report that the defendant had been previously convicted of the same offenses. Id. at 470-71. The Williams court had found the news report so prejudicial that the jurors' statements that they could disregard the newscast were "insufficient to obviate the problems of fairness caused by the news report." Id. at 471. The Bolinger court explained the differences between the two cases as follows:
 
 
 27
 Given the facts and circumstances of this case, juror Hunter's dissemination of information regarding money allegedly found under [the defendant's] mattress does not require a new trial. This information, although suppressed as evidence by the district court, is not nearly as inflammatory as the information involved in Williams. As such, its dissemination does not, as a matter of law, obviate the importance of the juror's testimony that the information had no effect on their verdict. The district court heard this testimony, and its evaluation of this testimony is entitled to great weight.
 
 
 28
 837 F.2d at 440 (citations omitted).
 
 
 29
 In light of this precedent, we conclude that the district court properly determined that the extrinsic evidence did not pose a "reasonable possibility of prejudice." Rowe, 906 F.2d at 656. As in Bolinger, only one juror read the newspaper article in question; none of the other jurors had any knowledge of the contents of the article. Also, the information regarding Mr. Levan's income and BankAtlantic's litigation with a minority shareholder was not nearly as inflammatory as the news report in Williams about the defendant's previous conviction on the same charges. The district court's determination that the evidence was not prejudicial is supported as well by its finding that the facts reported in the article would have been merely cumulative of facts already in evidence.[4] Finally, the district court found credible the jurors' testimony that the information had no effect on their impartiality.
 
 
 30
 The trial evidence, along with the jurors' post-trial testimony, supports the district court's determination that BankAtlantic was not prejudiced. Accordingly, the district court did not abuse its "large discretion" in concluding that the juror's consideration of the extrinsic evidence did not taint the jury's deliberations and require a new trial. Rowe, 906 F.2d at 657.
 
 
 31
 (b) Non-Disclosure During Voir Dire
 
 
 32
 The standard for determining when inaccurate juror responses necessitate a new trial was set forth in McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984): "To obtain a new trial ... a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." The first prong of the McDonough test requires a determination of whether the juror's answers were honest, "that is, whether he was aware of the fact that his answers were false." United States v. Perkins, 748 F.2d 1519, 1531 (11th Cir.1984). The second prong, that a correct response would have provided a valid basis for a challenge for cause, requires a showing of actual bias. Id. at 1532; see also United States v. Casamayor, 837 F.2d 1509, 1515 (11th Cir.1988).
 
 
 33
 In this case, the district court assumed that the jurors' answers were not honest for purposes of BankAtlantic's motion. We need not reach that question because the district court properly found that BankAtlantic failed to show that correct responses from Lippert or Chanquet would have provided a valid basis for a challenge for cause. As noted, in order to satisfy the second prong of the McDonough test, this circuit requires a showing of actual bias. Perkins, 748 F.2d at 1532 (citing United States v. Tutt, 704 F.2d 1567, 1569 (11th Cir.), cert. denied, 464 U.S. 855, 104 S.Ct. 174, 78 L.Ed.2d 156 (1983)). "Actual bias may be shown in two ways: 'by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed.' " Id. (quoting United States v. Nell, 526 F.2d 1223, 1229 (5th Cir.1976)). For example, in Perkins, the record contained numerous indications of the juror's bias, including his dishonesty, his concealment of the fact that he knew the defendant,[5] and his past involvement in similar litigation. Id. at 1532-33.
 
 
 34
 In the instant case, there was no express admission of actual bias. In addition, jurors Lippert and Chanquet were not closely connected to the case or to either party. BankAtlantic makes much of juror Lippert's employment with a former classmate of one of Painewebber's attorneys, but provides no specific facts that would create a presumption of bias. Unlike the juror in Perkins, there is no evidence that Lippert or Chanquet felt compelled to misrepresent themselves, that they knew either party, or that they were ever involved in similar litigation. Furthermore, as the Supreme Court stated in McDonough, "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can be said to affect the fairness of a trial." 464 U.S. at 556, 104 S.Ct. at 850. As the district court noted, neither Lippert nor Chanquet had a motive to conceal information just to get on the jury and find against BankAtlantic. There was no indication that either juror could not be impartial. Because BankAtlantic has failed to show actual bias, the district court did not abuse its discretion in denying the motion for new trial.
 
 
 35
 3. The Alleged Attack on Alan Levan as a Basis for a New Trial
 
 
 36
 BankAtlantic asserts that it is entitled to a new trial because of the alleged attack on Alan Levan during PaineWebber's direct examination and during closing argument. Specifically, BankAtlantic argues that PaineWebber's counsel improperly accused Mr. Levan of not coming to the stand during BankAtlantic's case, of personally owning BankAtlantic and of being a corporate raider. BankAtlantic also argues that evidence of Levan's income should have been excluded because it was irrelevant and highly prejudicial in violation of Federal Rules of Evidence 402 and 403.
 
 
 37
 In response, PaineWebber contends that evidence of Mr. Levan's financial dealings with BankAtlantic was admissible not only to measure credibility and bias, but because it went directly to PaineWebber's defense that Mr. Levan and his colleagues consciously sold the mortgages to which the interest rate swaps were matched.
 
 
 38
 In reviewing evidentiary determinations, we will not disturb a district court's rulings absent a clear showing of an abuse of discretion. Hessen v. Jaguar Cars, Inc., 915 F.2d 641, 645 (11th Cir.1990). The standard for determining whether a jury verdict should be set aside as a result of misconduct of counsel is whether the conduct was "such as to impair gravely the calm and dispassionate consideration of the case by the jury." Allstate Insurance Co. v. James, 845 F.2d 315, 318 (11th Cir.1988) (citation omitted). The trial judge is given broad discretion in controlling counsel's arguments. Absent an abuse of discretion, the decision of the trial court, "which has had the opportunity to hear the offensive remarks within the context of the argument and to view their effect on the jury, should not be disturbed." Id.
 
 
 39
 The cases cited by BankAtlantic in support of its argument, e.g., Koufakis v. Carvel, 425 F.2d 892 (2d Cir.1970), and McWhorter v. City of Birmingham, 906 F.2d 674 (11th Cir.1990), are distinguishable. In Carvel, the court ordered a new trial based on grossly improper and inflammatory references made by plaintiff's counsel that were "wholly unjustified by anything in the record." 425 F.2d at 901. Specifically, during the trial counsel likened the defendant to a Mafia don several times, characterized the defendant as vastly wealthy and the case as one of a "little" and virtuous man of modest resources against a powerful and unscrupulous man of untold wealth, and remarked frequently that the defendant had failed to testify. Id. at 902. "Moreover, ... [counsel] continually referred to matters which were not in the record and which were not relevant." Id. at 901. See also Gonzalez v. Volvo of America Corp., 734 F.2d 1221, 1225-26 (7th Cir.1984) (ordering new trial where counsel repeatedly referred to defendant's corporate size, portrayed it as preying on innocent consumers and referred to matters outside of the record solely to arouse jurors' sympathy); McWhorter v. City of Birmingham, 906 F.2d 674, 676-77 (11th Cir.1990) (affirming district court's decision to grant new trial because counsel's closing argument focused on theory eliminated during pretrial conference and on evidence expressly excluded by trial judge).
 
 
 40
 In contrast to McWhorter, PaineWebber did not introduce any evidence in violation of a ruling by the district court. Unlike the remarks in Carvel and Gonzalez, we cannot say that PaineWebber's references to Mr. Levan were either "wholly unjustified by anything in the record" or irrelevant. PaineWebber introduced evidence of Levan's compensation and referred to him as a "corporate raider." PaineWebber also claimed that Levan had "cooked the books" to hide BankAtlantic's losses from the interest rate swaps so that a $3 million dividend could be paid to him personally. While some of the arguments could be viewed as improper, they did not appear to be references to matters outside the record. Rather, PaineWebber's closing argument was based on evidence that was largely adduced from BankAtlantic's own witnesses.
 
 
 41
 Furthermore, the references to Mr. Levan's income and the $3 million dividend were relevant to support PaineWebber's contention that the payment of the high salaries and the dividend occurred at the same time that BankAtlantic claimed it had suffered staggering losses due to the interest rate swaps. The evidence of Mr. Levan's financial dealings with BankAtlantic also was relevant to PaineWebber's claim that Mr. Levan and his associates consciously sold the mortgages matched in the interest rate swaps.
 
 
 42
 The evidence was relevant not only to PaineWebber's defense, but also to show Mr. Levan's bias or interest in the outcome of the case.[6] "The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (citations and quotations omitted). Given Mr. Levan's financial interests in BankAtlantic, he clearly had a stake in the outcome of the litigation.
 
 
 43
 Contrary to BankAtlantic's contention, the district court did not abuse its discretion in admitting the evidence elicited during Mr. Levan's direct examination or in allowing PaineWebber's counsel to make the references to Mr. Levan during closing argument.
 
 
 44
 4. The Alleged Error in Excluding Impeachment Evidence of
 
 PaineWebber's Expert Witness Tanya Beder
 
 45
 BankAtlantic seeks a new trial on the ground that Tanya Beder, PaineWebber's expert witness, gave opinion testimony at trial which directly conflicted with the opinion she gave at her deposition and with statements she made in an article she had written.[7] BankAtlantic argues that the district court erred in admitting Ms. Beder's opinion testimony and in refusing to admit a draft of the article into evidence.
 
 
 46
 (a) Admission of Expert Testimony
 
 
 47
 The decision to admit or exclude expert testimony is a matter within the district court's discretion and will not be reversed unless it is "manifestly erroneous." United States v. Cross, 928 F.2d 1030, 1049 (11th Cir.1991); Stancill v. McKenzie Tank Lines, Inc., 497 F.2d 529, 535 (5th Cir.1974). BankAtlantic offers no facts or authority to support its contention that the district court's decision to admit the testimony was manifestly erroneous. In addition, the cases BankAtlantic cites do not support its assertion that a new trial is required. For example, Harre v. A.H. Robins Co., 750 F.2d 1501 (11th Cir.1985), involved a Rule 60(b)(3)[8] motion for a new trial based on the "intractable conflicts" between an expert witness' testimony at trial and his deposition testimony in a later case. Id. at 1504. In Harre, the witness testified at trial that he had conducted certain experiments; however, during his deposition in a later case, he testified that he had done no experiments. Id. The appellants established that the witness had committed perjury and that this misconduct prevented them from fully and fairly presenting their case. Id. at 1505. Appellant's reliance on Harre is misplaced. The present record reflects no such "intractable conflicts." After having the opportunity to hear all the prior testimony, the court found no merit in BankAtlantic's objection that Ms. Beder's testimony had changed. In further contrast to Harre, BankAtlantic was able to use the deposition during cross examination and had a full and fair opportunity to establish any inconsistencies. Under the circumstances of this case, we cannot say that the district court's decision to admit Ms. Beder's expert testimony was "manifestly erroneous" or that a new trial is required.
 
 
 48
 (b) Exclusion of Article
 
 
 49
 District judges have broad discretion with respect to the admissibility of evidence. United States v. Roger, 465 F.2d 996, 997 (5th Cir.), cert. denied, 409 U.S. 1047, 93 S.Ct. 517, 34 L.Ed.2d 498 (1972). When a witness admits making a prior inconsistent statement, extrinsic proof of the statement is excludable. Id.; see also United States v. Greer, 806 F.2d 556, 559 (5th Cir.1986) (holding taped statement in direct conflict with trial testimony excludable where on cross-examination witness admitted making statement); United States v. Sisto, 534 F.2d 616, 622 (5th Cir.1976) (holding that proof of prior inconsistent statement may be elicited by extrinsic evidence only if witness on cross examination denies making it). At trial, Ms. Beder admitted having made the statements in the article and explained that they were consistent with her testimony. Accordingly, the district court did not abuse its discretion in excluding the article.
 
 
 50
 5. Florida's "Economic Loss Rule" Does not Bar
 
 BankAtlantic's Tort Claims
 
 51
 PaineWebber maintains that BankAtlantic's entire appeal is moot because every claim BankAtlantic pursued at trial was barred under Florida law, which holds that a party to a contract cannot raise tort claims to recover solely economic damages flowing from a breach of contract unless the tort is independent of the breach of contract. See AFM Corp. v. Southern Bell Tel. & Tel. Co., 515 So.2d 180 (Fla.1987). This court adopted the AFM doctrine in Interstate Securities Corp. v. Hayes Corp., 920 F.2d 769, 773 (11th Cir.1991),[9] making clear that there is no bar to tort claims for injury or loss "outside the scope of the contract between the parties." Id. at 775.
 
 
 52
 BankAtlantic's position is that the two interest rate swaps were not encompassed in the contract that it entered into with PaineWebber. Until now, PaineWebber has argued that the interest rate swaps were outside of the contract. For example, in its memorandum in opposition to BankAtlantic's motion for j.n.o.v. or a new trial, PaineWebber stated the following:
 
 
 53
 The evidence amply demonstrated that the swaps were agreed to, or entered into, independent of any alleged financial advisor agreement.... [T]he evidence at trial established that the [financial advisor] agreement did not cover interest rate swaps.... Thus, even had the jury concluded that the swaps were entered into while the financial advisor agreement was effective, the evidence established that the agreement did not encompass the swaps.
 
 
 54
 PaineWebber cannot have it both ways. Because the interest rate swaps were outside the scope of the contract, Interstate Securities does not bar BankAtlantic's tort claims.
 
 
 55
 6. The District Court Did Not Err in Granting Judgment on
 
 
 56
 the Pleadings as to PaineWebber's Counterclaim
 
 
 57
 PaineWebber contends that the district court erred in dismissing its counterclaim for attorney's fees pursuant to its indemnification agreement with BankAtlantic because the court misinterpreted the indemnity provision to apply only to third party claims.
 
 
 58
 Contract interpretation is a legal question subject to de novo review by this Court. Gibbs v. Air Canada, 810 F.2d 1529, 1532 (11th Cir.1987). Construction of an indemnity agreement generally is a question of law for the court applying generalized principles of contract construction. Id. at 1533. Accordingly, our task is to determine the parties' intent with regard to the scope of the indemnity agreement. Id. "In determining this intent, contract provisions should be given their natural and most commonly understood meaning in light of the subject matter and circumstances, and the language should be read in common with the other provisions of the contract." Id. (citations omitted).
 
 
 59
 Citing this latter principle, PaineWebber claims that the pertinent language is contained in "three successive sentences" which should be read together. According to PaineWebber, the unambiguous language of the agreement provides that (1) BankAtlantic would indemnify it for "any and all losses, claims, damages and liabilities"; (2) BankAtlantic agreed to "reimburse [PaineWebber] for any reasonable expenses incurred (including reasonable fees and disbursements of counsel) in connection with the defense of any formal or informal claim, action, investigation or other proceeding caused by or arising out of or in connection with [PaineWebber's] acting pursuant to [this agreement]"; and (3) the only circumstance in which BankAtlantic was not required to indemnify PaineWebber was for "losses, claims, damages or liabilities ... which a court of competent jurisdiction shall have determined by a final judgment to have primarily resulted from the wilful misconduct or gross negligence on the part of [PaineWebber]." Agreement at 2. PaineWebber argues that the district court's construction of the indemnity provision as applying only to third party claims renders the "any and all" language meaningless and effectively rewrites the agreement. We disagree.
 
 
 60
 Based on our application of the above principles of contract construction, we find that the district court correctly interpreted the indemnity agreement as applying solely to third parties. Like PaineWebber, we apply the principle set forth in Gibbs, that "language should be read in common with the other provisions in the contract"; however, we reach a different result. In addition to the "three successive sentences" on which PaineWebber focuses, the indemnity agreement contains additional language which supports the district court's finding that agreement was not intended to release PaineWebber from claims by BankAtlantic, but rather to indemnify it against third party claims. The opening sentence states the following: "Since [PaineWebber] will be acting on behalf of [BankAtlantic],
 
 
 61
 [BankAtlantic] agrees that it will hold harmless [PaineWebber], its officers, directors, agents and affiliates...." Agreement at 1. The agreement further provides as follows:
 
 
 62
 Promptly after receipt [by PaineWebber] of notice of any complaint, the commencement of any action or proceeding or the actual receipt of written notice of any claim in connection with any matter related to [PaineWebber's] activities pursuant to the Engagement Letter, [PaineWebber] will notify [BankAtlantic] in writing of such complaint or the commencement of such action or proceeding or the actual receipt of written notice of any claim and if [BankAtlantic] so elects or is requested by [PaineWebber],
 
 
 63
 [BankAtlantic] will assume the defense of such action....
 
 
 64
 Agreement at 2.
 
 
 65
 The requirement of notice to BankAtlantic upon PaineWebber's receipt of a complaint or notice of any claim in connection with PaineWebber's activities clearly contemplates third party claims, not claims by BankAtlantic against PaineWebber. As the district court correctly noted, the plain language of the agreement indicates that the parties intended to indemnify PaineWebber solely against third party claims resulting from PaineWebber's agency relationship with BankAtlantic.
 
 
 66
 While we agree with the district court's interpretation of the indemnification agreement, ultimately PaineWebber's assertion of its right to expenses pursuant to that agreement must be rejected on other grounds. As discussed above, and as PaineWebber has contended throughout this litigation, the interest rate swaps were not within the scope of the financial advisor agreement. The indemnification agreement clearly states that the indemnification is for actions arising out of the financial advisor agreement. Agreement at 2. Because the interest rate swaps were outside the scope of the underlying agreement, they are similarly outside the scope of the indemnification agreement. Consequently, the district court did not err in dismissing PaineWebber's counterclaim, even though it did so on other grounds.
 
 
 67
 7. PaineWebber's Motion for Sanctions and Attorney's Fees
 
 
 68
 On October 11, 1990, almost a year after the Final Judgment on the jury verdict was entered, PaineWebber filed a motion for sanctions pursuant to Federal Rule of Civil Procedure 11[10] and Florida Statutes § 57.105.[11] The motion alleged that BankAtlantic and its counsel initiated the underlying action with the knowledge that BankAtlantic had suffered no injury, loss or damages and that its claims were not well grounded in fact or warranted by existing law. The district court denied the motion in an order entered October 26, 1990.
 
 
 69
 PaineWebber argues that the court abused its discretion in denying the motion and that the order "is fatally defective because it lacks an adequate evaluation as to the reason for denying the Rule 11 sanctions."[12] Brief at 14. In response, BankAtlantic contends that the district court adequately explained its decision and that PaineWebber's motion was untimely.
 
 
 70
 The standard for reviewing the October 26, 1990 order is abuse of discretion. Pelletier v. Zweifel, 921 F.2d 1465, 1514 (11th Cir.1991). The requirement of an explanation for the decision is mandated when "the basis and justification for a Rule 11 decision is not readily discernible on the record...." Knight v. Sharif, 875 F.2d 516, 519 (5th Cir.1989) (quoting Thomas v. Capital Security Servs., 836 F.2d 866 (5th Cir.1988)).
 
 
 71
 Contrary to PaineWebber's assertion, the rationale for the district court's decision was readily discernible. At the time the motion was denied, the court had already considered and denied PaineWebber's motion for directed verdict at the close of BankAtlantic's case in chief and the renewal of such motion after the close of all the evidence. In addition to evidence adduced by both parties, the court had the benefit of all the post-trial memoranda in which the "no damage" argument was also raised. Implicit in the court's denial of the Rule 11 motion was its determination at the close of all the evidence that there was sufficient evidence for a jury to consider. This determination was the antithesis of the basis for a Rule 11 sanction. Consequently, the district court did not abuse its discretion in denying PaineWebber's motion for rule 11 sanctions. In light of the court's proper disposition of the motion, we decline to reach the timeliness issue.
 
 Conclusion
 
 72
 As the learned trial judge so aptly stated in his Omnibus Order of January 19, 1990, "this cause presented the classic dispute for trial by jury." There was substantial evidence from which the jury reasonably found for PaineWebber. BankAtlantic received a full and fair trial on the merits. We find no error in the trial court's evidentiary rulings. The Final Judgment on the jury verdict and the Judgment on the Counterclaim were properly entered. The district court did not abuse its "large discretion" in denying the motions for new trial based on jury misconduct nor did it abuse its discretion in denying the motion for sanctions. For these reasons, the rulings and judgments appealed from are
 
 
 73
 AFFIRMED.
 
 
 
 *
 Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 An interest rate swap is an agreement by which one party agrees to pay the counterparty a fixed rate of interest on a notional amount for a specified period of time. In return, the counterparty agrees to pay the first party an adjustable rate of interest on the same notional amount for the same period of time
 
 
 [2]
 BankAtlantic abandoned its breach of contract claim at trial and the district court dismissed that claim with prejudice
 
 
 [3]
 PaineWebber's appeal from the district court's order granting BankAtlantic judgment on the pleadings on the counterclaim, Case No. 90-5142, has been consolidated with BankAtlantic's appeal from the jury's final judgment, Case No. 90-5162, and with BankAtlantic's appeal from the district court's denial of BankAtlantic's motion for a new trial, Case No. 90-5776
 
 
 [4]
 The district court noted that it had excluded the facts in the article relating to the shareholder suit because the information was irrelevant, not because it was prejudicial
 
 
 [5]
 In fact, the juror's conduct in Perkins went beyond mere non-disclosure:
 although [the juror] did not recall knowing [the defendant] or being on a committee with him during voir dire, he remembered this association during trial and jury deliberations, but then forgot about it again during the post-trial hearing until the testimony of his fellow jurors reminded him. We do not find this sequence credible.
 748 F.2d at 1532.
 
 
 [6]
 BankAtlantic claims that PaineWebber called Mr. Levan as a witness solely to inflame the jury with information about his income and the image of him as a "corporate raider," which is an abuse of Federal Rule of Evidence 607
 Rule 607 provides: "The credibility of a witness may be attacked by any party, including the party calling the witness." Fed.R.Evid. 607. However, under Rule 607 a witness may not be called to the stand solely for the purpose of impeaching him and thereby obtaining testimony that is otherwise inadmissible. Balogh's of Coral Gables, Inc. v. Getz, 798 F.2d 1356, 1358 n. 2 (11th Cir.1986); See generally Sheila A. Skojec, Annotation, Propriety, under Federal Rule of Evidence 607, of Impeachment of Party's Own Witness, 89 A.L.R.Fed. 13 (1988).
 BankAtlantic's argument is without merit. As discussed above, the testimony PaineWebber elicited from Mr. Levan was not "otherwise inadmissible" because it was relevant to its defense.
 
 
 [7]
 BankAtlantic alleges that Ms. Beder testified in deposition that the first $35 million swap was hedged against a $35 million stand by commitment for mortgage-backed securities, while the second swap was hedged against $50 million of fixed rate mortgages. At trial, however, she testified that the $85 million of swaps were hedged against a pool of $160,000 million of mortgages with yields of 12% or more. In addition, BankAtlantic claims that Ms. Beder's testimony at trial that the swaps were safe and risk-free hedges conflicted with an article she had written about the high risks of hedging
 
 
 [8]
 Rule 60(b)(3) provides in pertinent part as follows:
 On motion upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons ... (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.
 Fed.R.Civ.P. 60(b)(3).
 
 
 [9]
 In Interstate Securities, a securities brokerage firm brought an action against its client and the client's guarantor to recover an amount owed following the liquidation of the account. In turn, the client and guarantor asserted a counterclaim for breach of fiduciary duty, among other claims, against the firm. Relying on AFM, the Court of Appeals held that the client and guarantor could not recover tort damages under Florida law for breach of fiduciary duty since that claim was dependent upon existence of contract. 920 F.2d at 776-77
 
 
 [10]
 Rule 11 provides in relevant part as follows:
 The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
 Fed.R.Civ.P. 11.
 
 
 [11]
 In pertinent part, Section 57.105, Florida Statutes, provides as follows:
 The Court shall award reasonable attorney's fees to be paid to the prevailing party in equal amounts by the losing party and the losing party's attorney in any civil action in which the court finds that there was a complete absence of a justiciable issue of either law or fact raised by the complaint or defense of the losing party; provided, however, the losing party's attorney is not personally responsible if he has acted in good faith, based on the representations of his client.
 Attorney's fees pursuant to Florida Statute § 57.105 may be awarded to the prevailing party in a suit brought in federal court. Capital Factors, Inc. v. Heller Fin., Inc., 712 F.Supp. 908, 914 (S.D.Fla.1989).
 PaineWebber has not argued specifically that the district court's order violated section 57.105. However, the language of section 57.105 appears to be more stringent than that of rule 11 in requiring "that there was a complete absence of a justiciable issue of law or fact raised by the complaint ... of the losing party." Accordingly, rejection of a rule 11 sanction clearly subsumes a denial of a statutory award of attorney's fees to the prevailing party.
 
 
 [12]
 The court stated that it was "intimately" familiar with the proceedings. In denying the motion for Rule 11 sanctions, the court further stated the following:
 We have carefully scrutinized the Motion for Sanctions Pursuant to Rule 11 and responses. As is normal, the work products from both parties is excellent. However, we believe the motion must be denied. The parties will recall that at the time the court denied the motion for directed verdict, it observed that the case presented a "classic jury question." We continue to abide by that position. Given that observation, we do not deem this case warrants Rule 11 sanctions.