**Issac HILLIARD and Fred Taylor, Plaintiffs,**

v.

**William H. BLACK, et al., Defendants.**

### No. 1:00CV80 MMP.

United States District Court, N.D. Florida, Gainesville Division.

Nov. 8, 2000.

Jeffrey Allan Sudduth, Hector & Marke LLP, Miami, FL, Lance A. Harke, Harke & Clasby LLP, Miami, FL, for Plaintiffs.

William H. Black, Miami, FL, Pro se.

Ethan H. Cohen, Kutak Rock LLP, Atlanta, GA, for Defendants.

Robert C. Ellenberg, Columbia, SC, Pro se.

Lisa Adams, Lexington, SC, Pro se.

Jimmy B. Roof, West Columbia, SC, Pro se.

## ORDER

PAUL, Senior District Judge.

A hearing was held on September 1, 2000 to address the following three matters:

1. Defendants Black and PMI, Inc.'s Motion to Dismiss (Doc. 4)

2. Defendants Black and PMI, Inc.'s Motion for Clarification Regarding Submission of Initial Scheduling Order (Doc. 18)

3. Plaintiffs' Motion for Enlargement of Deadlines Established by the Court's Initial Scheduling Order (Doc. 23)

## 1. Defendants Black and PMI, Inc.'s Motion to Dismiss (Doc. 4)

*Legal Standard for Motion to Dismiss*

To warrant dismissal of a complaint under Fed.R.Civ.P. 12(b)(6), the Court must be satisfied "that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Blackston v. Alabama,* 30 F.3d 117, 120 (11th Cir.1994) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). Determining the propriety of granting a motion to dismiss requires courts to accept all the factual allegations in the complaint as true and to evaluate all inferences derived from those facts in the light most favorable to the plaintiff. *See Hunnings v. Texaco, Inc.,* 29 F.3d 1480, 1483 (11th Cir.1994); *Lopez v. First Union National Bank of Florida,* 129 F.3d 1186 (11th Cir.1997). The threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low. *See Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 703 (11th Cir.1985) (citation omitted); *Jackam v. Hospital Corp. of America Mideast, Ltd.,* 800 F.2d 1577, 1579 (11th Cir. 1986). "[U]nless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," the complaint should not be dismissed on grounds that it fails to state a claim upon which relief can be granted. *Sea Vessel, Inc. v. Reyes,* 23 F.3d 345, 347 (11th Cir.1994) (citation omitted); *see also Lopez,* 129 F.3d 1186 (quoting *Pataula Electric Membership Corp. v. Whitworth,* 951 F.2d 1238, 1240 (11th Cir.1992)). Nevertheless, to survive a motion to dismiss, a plaintiff must do more than merely "label" his claims. *Blumel v. Mylander,* 919 F.Supp. 423, 425 (M.D.Fla.1996). Moreover, when on the basis of a dispositive issue of law no construction of the factual

allegations will support the cause of action, dismissal of the complaint is appropriate. *See Marshall County Bd. of Educ. v. Marshall County Gas Dist.,* 992 F.2d 1171, 1174 (11th Cir.1993). When a more carefully drafted complaint might state a claim, it is preferable for the court to give the plaintiff at least one opportunity to amend the complaint. *See Long v. Satz,* 181 F.3d 1275, 1279 (11th Cir.1999) (citing *Bank v. Pitt,* 928 F.2d 1108, 1112 (11th Cir.1991)).

*Facts and Procedural History* [1]

Plaintiffs, Issac Hilliard ("Hilliard") and Fred Taylor ("Taylor") brought suit against the following Defendants: William H. Black ("Black"); James A. Franklin, Jr. ("Franklin"); Alfred Twitty ("Twitty"); Lisa Adams ("Adams"); Professional Management, Inc. ("PMI"); Professional Management Consulting, Inc. ("PMC"); P.E. Communications, Inc. ("PE"), Jimmy B. Roof ("Roof"); Robert C. Ellenburg ("Ellenburg"), Roof & Ellenburg, LLC ("R & E"); Richard Homa ("Homa"); and Cash 4 Titles, Inc. *See* Plaintiffs Compl. (Doc. 1), at 1. Defendants Black, Franklin, Twitty, Adams, PMI, PMC, and PE are referred to in the complaint as the PMI Defendants. *See* Plaintiffs' Compl. (Doc. 1) ¶ 15, at 4. Plaintiffs allege Counts I through VIII as follows: breach of fiduciary duty; conversion; negligence; civil conspiracy in connection with the sale of Black Americans of Achievement ("BAOA") securities; civil conspiracy in connection with the Cash 4 Titles scheme; unlicensed sale of securities; violation of federal securities laws; and breach of contract. Defendants Black and PMI, Inc. move that counts I through VII, be dismissed. *See* Defendants' Motion to Dismiss (Doc. 4), at 2–3. Count VIII is not brought against Defendants Black and PMI.

Plaintiff Issac Hilliard is a professional athlete and citizen of New Jersey. *See id.*

¶ 5, at 2. Plaintiff Fred Taylor is a professional athlete and citizen of Florida. *See id.* ¶ 15, at 4. Defendant Black at all times relevant to this action was the Chairman and Chief Executive Officer of PMI located in Columbia, South Carolina, and was licensed by the National Football League Players Association ("NFLPA") as a Contract Advisor or "sports agent." *See id.* ¶ 7, at 2–3. Defendant Black is a professional sports agent who represents approximately 35 professional athletes in the National Football League ("NFL") and the National Basketball Association ("NBA"), including Plaintiffs Hilliard and Taylor. *See id.* ¶¶ 26 & 29, at 7 & 8. Defendant Black, through Defendants PMI and PMC, negotiates his clients' contracts with teams affiliated with the NFL and NBA, and Defendant PMI typically receives three to four percent of its clients' bonuses and salaries in return for this representation. *See id.* Further, PMI provides its clients with financial services that include investment and retirement planning. *See id.* ¶ 27, at 7. Plaintiffs allege that they are "unsophisticated with respect to business and financial matters" and that they "relied completely on the advice and expertise of Defendants Black, Franklin, and PMI" who "exercised substantial if not complete control and authority over the financial decisions of Plaintiffs and others." *Id.* ¶ 29, at 8.

Plaintiffs allege that PMI Defendants perpetrated two major financial scams. First, Defendant Black became president of Black Americans of Achievement, Inc. ("BAOA"), a California corporation formerly based in San Diego, in October 1995. *See id.* ¶ 30, at 8. BAOA's primary business was the production of a board game regarding the accomplishments of African–Americans. *See id.* In 1996, Defendant Black, arranged for PMI clients to pro-

---

1. For the purposes of determining whether to grant a motion to dismiss, the Court must accept all the factual allegations in the complaint as true and to evaluate all inferences derived from those facts in the light most favorable to the plaintiff. *See Hunnings v. Texaco, Inc.,* 29 F.3d 1480, 1483 (11th Cir. 1994); *Lopez v. First Union National Bank of Florida,* 129 F.3d 1186 (11th Cir.1997).

mote BAOA's board game in exchange for free, restricted BAOA stock. *See id.* ¶ 32, at 8. However, Plaintiffs were never informed of these arrangements and never agreed to endorse the BAOA board game. *See id.* ¶ 33, at 8. Further, Defendant Black falsely represented to BAOA that he had "power of attorney" to bind his clients. *See id.* ¶ 34, at 8–9. Defendant Black falsely informed BAOA that his PMI clients had promoted the BAOA board game and were entitled to free stock. *See id.* ¶ 35, at 9. As a result, BAOA issued two million shares of free stock in the names of fifteen PMI clients, and BAOA sent stock certificates to Defendant PMI. *See id.* ¶ 36, at 9.

Defendant Black in turn sold the BAOA stock to his clients at PMI, including Plaintiff Hilliard, for prices that were above the then current market prices. *See id.* ¶ 37, at 9. Defendant Black sold the BAOA stock to Plaintiff Hilliard and other PMI clients for $1,240,000. *See id.* ¶ 39, at 9. Defendant Black directed PMI clients to pay for BAOA stock with checks made payable to PE Communications, Inc. ("PE"), a shell company created by Black. *See id.* ¶ 38, at 9. Black also directed that over $1 million in funds be transferred from the PE account to his personal bank accounts. *See id.* ¶ 39, at 9.

Defendants Black and PMI were also involved with the Cash 4 Title scheme. Defendants Roof and Ellenburg, operating Defendant R & E, raised $300 million by selling promissory notes to individuals throughout the United States. *See id.* ¶ 42, at 10. Roof and Ellenburg represented that the promissory notes were to be invested in the car title loan industry, including Defendant Cash 4 Title, Inc., which offers—as do most car title companies—loans at very high interest rates to persons with poor credit ratings; the loans are secured by car titles that are transferred to the company in case of default. *See id.* ¶¶ 43–44, at 10. However, Roof and Ellenburg did not invest the proceeds from the sale of promissory notes in the

car title business; Roof and Ellenburg transferred funds into United States bank accounts and subsequently to bank accounts in the Cayman Islands. *See id.* ¶ 45, at 10.

In late 1997, Defendants Roof and Ellenburg met several times with Defendants Black and Franklin regarding investment in Cash 4 Titles, Inc. *See id.* ¶ 48, at 11. Defendants Roof and Ellenburg offered to pay Black, Franklin, and clients of PMI a three percent monthly return on any funds invested. *See id.* Defendant Black invested personal funds and received the full three percent monthly return and agreed to invest funds received from PMI clients in the notes. *See id.* ¶ 49, at 11. Defendants Black and Franklin entered into an agreement with Defendants Roof and Ellenburg to pay Plaintiffs and other PMI clients, who were invested in the promissory notes, only 1.67 percent of the monthly return and to retain the remaining 1.33 percent for Defendant PMC, an affiliate of PMI. *See id.* ¶ 13 & 50, at 4 & 11.

Defendants Black and Franklin made the following false statements to PMI clients regarding investment in the promissory notes; (1) that the investment in promissory notes was safe and extremely lucrative; (2) that the funds would primarily be used for the growth and expansion of Cash 4 Titles, Inc.; and (3) that Defendants had no financial interest in the investment. *See id.* ¶ 52, at 12. Defendants Black and Franklin did not inform PMI clients that forty percent of the monthly return paid by Defendants Roof and Ellenburg would be retained by PMC. *See id.* Following the advice of Defendants Black and Franklin, Plaintiffs and other PMI clients invested approximately $8.4 million in the promissory notes. *See id.* ¶ 53, at 12. Plaintiff Hilliard, acting on advice from Defendants Black and Franklin, liquidated his stock portfolio, which was worth approximately $1 million and which was intended to fund his retirement, in order to invest in the promissory notes. *See id.* ¶ 54, at 12. Defendant PMI directed that

Plaintiff Hilliard's stock portfolio be liquidated even though a broker warned that such action was ill-advised and would result in substantial penalties. *See id.*

Additionally, Defendant Franklin drafted a consulting agreement dated January 1, 1998 between PMC and J.B. Roof & Associates, Inc. ("J.B.Roof"), an entity controlled by Defendant Roof, in an effort to conceal that Defendants Franklin and Black were retaining 40 percent of their PMI clients' investment returns. *See id.* ¶ 55, at 12–13. Pursuant to the agreement, PMC was to provide consultation services to J.B. Roof and to issue monthly invoices for payment, but no specific fee amount or formula for determining the fees was stated in the agreement. *See id.* No consulting services were rendered by Defendant PMC, and from early 1998 through early 1999, Defendant Roof made periodic payments to Defendant PMC totaling $375,000, allegedly for consulting services but really pursuant to the interest-skimming agreement. *See id.* ¶ 57, at 13.

When Defendants Roof and Ellenburg received investment funds from PMI clients. Roof and Ellenburg would wire the funds to bank accounts in the Cayman Islands that were created as part of the Cash 4 Title Ponzi scheme. *See id.* ¶ 58, at 13. Defendant Roof paid monthly interest to each PMI client in an amount equivalent to 1.67 percent of the PMI clients' investment balance, and delivered cashier's checks in those amounts to PMI's offices for deposit in the PMI clients' respective bank accounts. *See id.* Defendant PMI arranged for its clients to open accounts with Defendants Roof and Ellenburg and frequently directed Roof to deposit and withdraw PMI client funds. *See id.* ¶ 59, at 13.

In April 1998, Defendant Black directed Defendant Adams to instruct Defendant Roof to transfer the funds—totaling $6,135,000—of PMI's largest five investors, including Plaintiff Hilliard, to Cayman Island bank accounts created by Everest Management ("Everest"), a Cayman Islands-based entity used by those involved with Cash 4 Titles, Inc. to form international business corporations ("IBCs") and to establish bank accounts for the IBCs. *See id.* ¶¶ 60–61, at 14. The transfer of PMI clients' funds to accounts established by Everest Management enabled Defendants Black and Franklin to control the investments of Plaintiffs and other PMI clients and to control the administration of the interest paid on those investments. *See id.* ¶ 62, at 14. Further, the transfer of funds to Everest Management eliminated Defendants Black and Franklin's need to use Defendants Roof and Ellenburg to issue promissory notes, and Defendants Black and Franklin issued new promissory notes to PMI clients to replace the previous Roof and Ellenburg notes. *See id.* ¶¶ 63–64, at 14.

The splitting of the investment return on the promissory notes also changed after the transfer to Everest Management. *See id.* ¶ 65, at 14–15. Prior to the transfer, Plaintiffs and other PMI clients' investments in the promissory notes yielded a 4.50 percent monthly return. *See id.* Of that amount, PMI clients received a 1.67 percent return, Defendant PMC received a 1.33 percent return, Defendant Roof retained a 1.00 percent return, and Defendant Ellenburg retained a 0.50 percent return. *See id.* Under the new arrangement in mid–1998, Defendants Roof and Ellenburg continued to retain a 1.50 percent return and began transferring the remaining 3.00 percent return to the Cayman Islands bank accounts controlled by Defendant Black, which included accounts in the name of Ashford Development that also were controlled by Defendant Black. *See id.* ¶ 66, at 15. Following a dispute between Defendants Roof and Black, Defendant Roof forfeited his 1.00 percent return, and Defendants Black and Franklin began receiving 4.00 percent in monthly investment returns. *See id.* ¶ 67, at 15. Defendants Black and Franklin ceased distributing any returns to Plaintiffs or other

PMI clients and represented that the 1.67 percent return, which PMI clients had customarily received, was being "rolled over" and reinvested with PMI clients' principal balance in the promissory notes. *See id.* ¶ 69, at 15. The investment returns were not reinvested but were misappropriated and diverted by Defendants Black and Franklin. *See id.* ¶ 70, at 15–16.

Defendant Black, after gaining control of the interest payments, advised existing clients to invest additional funds in the promissory notes, and persuaded new clients, such as Plaintiff Taylor, to invest in the promissory notes. *See id.* ¶ 72, at 16. Defendant Black advised Plaintiff Taylor to invest in the Cash 4 Titles promissory notes, and Defendant Black stated that the promissory notes would yield a $600,000 return on a $3 million investment. *See id.* ¶ 73, at 16. Plaintiff Taylor eventually invested $3.4 million, consisting of his signing bonus with the Jacksonville Jaguars, in the promissory notes. *See id.* ¶ 74, at 16.

### Discussion

#### A. *Counts I, II, III, IV, and V*

Defendants Black and PMI, Inc. move that Counts I through V are barred by Florida's economic loss rule. *See* Def. Motion to Dismiss (Doc. 4), at 2. In Count I, Plaintiffs allege that PMI Defendants breached their fiduciary duty to Plaintiffs by inducing Plaintiffs to invest millions of dollars in the BAOA and Cash 4 Titles schemes. *See* Plaintiffs' Compl. (Doc. 1) ¶¶ 77–86, at 17–18. PMI Defendants consist of Black, Franklin, Twitty, Adams, PMI, PMC, and PE. *See id.* ¶ 15, at 4. In *Crowell v. Morgan Stanley Dean Witter Serv. Co.,* 87 F.Supp.2d 1287, 1289 (S.D.Fla.2000) (citing Compl. ¶¶ 3 & 5), a tort claim for breach of fiduciary duty was brought by the plaintiffs who alleged that the defendants developed trust funds "to exploit and target brokerage customers to switch from their low-risk investments (e.g., certificates of deposit, money market

funds, mutual funds, etc.)" to the trust funds.

In *Crowell,* the defendants presented the trust funds as " 'very safe alternatives' " that were capable of yielding higher returns when the trust funds were in fact " 'extremely high risk bond funds.' " *Id.* (quoting Crowell's compl. ¶ 5). The defendants in *Crowell* moved to dismiss the breach of fiduciary duty tort claim on the grounds that the tort claim was barred by the Florida economic loss rule. *See id.* at 1290. The court in *Crowell* held that although a contract was involved, the plaintiff's claims for breach of fiduciary duty against his securities brokers for misrepresenting material facts regarding investments were not automatically barred by the economic loss rule. *See id.* at 1293; *see also Performance Paint Yacht Refinishing, Inc. v. Haines,* 190 F.R.D. 699, 701 (S.D.Fla.1999) ("while provisions of a contract may impact a legal dispute, the mere existence of a contract should not necessarily serve to bar a separate action in tort based on the contract even though the damages are purely economic in nature;" thus, the plaintiff's breach of fiduciary duty claim was not barred by the Florida economic loss rule). The court in *Crowell* provides a cogent analysis of the evolution of Florida's economic loss rule and its application to the common law tort of breach of fiduciary duty, which this Court adopts and paraphrases below. *See id.* at 1292–93.

The Florida Supreme Court, prior to 1999, held that a plaintiff may not maintain a tort action to recover economic damages that arise from a contract unless the claims are for physical injury or property damage. *See AFM Corp. v. Southern Bell Telephone & Telegraph Co.,* 515 So.2d 180, 181 (Fla.1987) ("parties to a contract can only seek tort damages if conduct occurs that establishes a tort distinguishable from or independent of the breach of contract.") Prior to 1999, courts, including the Eleventh Circuit, interpreted the Florida economic loss rule to bar any tort claim not

completely separate and independent from a contract. *See Interstate Securities Corp. v. Hayes Corp.*, 920 F.2d 769, 773 (11th Cir.1991) (applying *AFM* to bar breach of fiduciary duty claim in securities context).

In 1999, the Florida Supreme Court sought to limit the "unprincipled extension" of the economic loss rule. *See Moransais v. Heathman*, 744 So.2d 973, 981 (1999). In *Moransais*, a homeowner brought a professional negligence claim against the engineering firm and individual engineers who negligently inspected the plaintiff's house when the engineers failed to detect and disclose certain defects in the house inspection. *See id.* at 974–75. The Florida Supreme Court held that despite the existence of a contract between the parties, the plaintiff's claim of professional negligence was not barred by the economic loss rule:

> [T]he mere existence of a contract between the professional services corporation and a consumer does not eliminate the professional obligation of the professional who actually renders the service to the consumer or the common law action that a consumer may have against a professional provider .... We conclude that the principles underlying the economic loss rule are insufficient to preclude an action for professional malpractice under the circumstances presented here. *Id.* at 983.

The Florida Supreme Court limited the holding in *Moransais* explicitly to the claim for professional negligence. However, the Florida Supreme Court concluded that the economic loss rule was being applied too broadly and was barring traditional tort causes of action. The Florida Supreme Court provides as follows:

> Today, we again emphasize that by recognizing that the economic loss rule may have some genuine, but limited, value in our damages law, we never intended to bar well-established common law causes of action, such as those for neglect in providing professional services. Rather, the rule was primarily

intended to limit actions in the product liability context, and its application should generally be limited to those contexts or situations where the policy considerations are substantially identical to those underlying the product liability-type analysis. *Id.* at 983.

Florida District Courts of Appeal have interpreted the *Moransais* holding differently. The Third District Court of Appeals held that the Florida economic loss rule did not bar a breach of fiduciary duty claim when the plaintiff sued his securities brokers for misrepresenting material facts regarding the investment. *See Crowell*, 87 F.Supp.2d at 1293 (citing *First Equity Corp. of Florida, Inc. v. Watkins*, 1999 WL 542639, at *1 (Fla. 3d DCA 1999) (Watkins sued First Equity alleging that First Equity had misrepresented material facts regarding the investment)); *see also Ron's Quality Towing, Inc. v. Southeastern Bank of Florida*, 765 So.2d 134, 136 (2000) (First District Court reversed trial court's grant of summary judgment and reinstated the plaintiff's claim of breach of fiduciary duty; claim was not barred by Florida economic loss rule.); *Invo Florida, Inc. v. Somerset Venturer, Inc.*, 751 So.2d 1263, 1267–68 (2000) (economic loss rule has not abolished the cause of action for breach of fiduciary duty, even when an underlying oral or written contract is present); *but see Clayton v. State Farm Mutual Automobile Ins. Co.*, 729 So.2d 1012, 1014 (Florida economic loss rule still bars a breach of fiduciary duty claim, despite exception for claims based on torts that are independent of contractual breach, when alleged breach of fiduciary duty is directly related to breach of contract; the defendant failed to use parts of "like kind and quality" as specified in the contract.). The Third District Court stated:

> Breach of fiduciary duty is just such a well-established cause of action in tort. Many fiduciaries are appointed pursuant to a written contract, such as a trustee under an express trust, or an escrow agent under a written escrow agree-

ment. It is well understood that the law imposes fiduciary duties in such cases, and that liability can arise when fiduciary duties are breached. We think the *Moransais* opinion makes it quite clear that the economic loss rule has not abolished the cause of action for breach of fiduciary duty, even though there is an underlying written or oral contract. *See id.* (quoting *First Equity Corp.,* 1999 WL 542639, at *1).

Further, the Third District Court stated that the Eleventh Circuit's decision in *Interstate Securities Corp. v. Hayes Corp.,* 920 F.2d 769, 773 (11th Cir.1991) could no longer be "regarded as good law on this point," since it was decided at a point when Florida law regarding this issue was "not entirely clear," prior to the *Moransais* decision. *Id.* (quoting *First Equity Corp.,* 1999 WL 542639, at *2 n. 3).

In *Interstate Securities,* the defendants asserted a counterclaim of breach of fiduciary duty against the security broker plaintiffs. *See Interstate Securities Corp. v. Hayes Corp.,* 920 F.2d 769, 776 (11th Cir.1991). The Eleventh Circuit in *Interstate* concluded that the breach of fiduciary duty claim was foreclosed under *AFM* since no personal injury or property damage occurred in *Interstate. See id.* In the *AFM* case, the Florida Supreme Court held that without evidence of personal injury or property damage, a plaintiff cannot raise tort claims for the recovery of solely economic damages flowing from a breach of contract. *See AFM Corp. v. Southern Bell Telephone & Telegraph Co.,* 515 So.2d 180, 181 (1987); *but see HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.,* 685 So.2d 1238, 1239 (1996) ("The economic loss rule has not eliminated causes of action based upon torts independent of the contractual breach even though there exists a breach of contract action. Where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from the acts that breached the contract.").

Thus, the Court is left to discern which interpretation of the Florida economic loss rule is appropriate: the Third District Court's interpretation in *First Equity* or the Eleventh Circuit in *Interstate Securities?* In diversity cases arising under Florida law, a federal court is bound by the law articulated by the Florida Supreme Court. *See Small Business Administration v. Echevarria,* 864 F.Supp. 1254, 1262 (S.D.Fla.1994). If the state's highest court does not provide any guidance, federal courts are "bound to adhere to the decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.,* 710 F.2d 678, 690 (11th Cir.1983); *Liberty Mutual Ins. Co. v. Electronic Systems, Inc.,* 813 F.Supp. 802, 805 (S.D.Fla. 1993). Whether or not the federal court agrees with the reasoning of the state court's decision or the outcome which the decision dictates, the federal court is bound by this rule. *See id.* (citing *Delta Air Lines, Inc. v. McDonnell Douglas Corp.,* 503 F.2d 239, 245 (5th Cir.1974), *cert. denied* 421 U.S. 965, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975)).

No "persuasive indication" is present that the Florida Supreme Court would disagree with the Third District Court of Appeals. While the Florida Supreme Court did not overrule its holding in *AFM Corp.,* a careful examination of the *Moransais* reveals that *AFM Corp.* was cited as an example of a holding which "appeared to expand the application of the rule beyond its principled origins and contributed to applications of the rule by trial and appellate courts to situations well beyond our original intent." *Moransais,* 744 So.2d at 981. The Florida Supreme Court stated that while it believes "the outcome of [*AFM Corp.*] is sound," it "may have been unnecessarily overexpansive in [its] reliance on the economic loss rule as opposed to fundamental contractual principles." *Id.*

Since no persuasive indication is present that the Florida Supreme Court would rule contrary to the Third District Court in *First Equity*, this Court is bound by the holding in *First Equity*. Regardless of whether *Interstate* or *First Equity* applies, Plaintiffs have made factual allegations that PMI Defendants' acted intentionally and that such acts are independent of any acts that may have breached an oral or written contract between the Plaintiffs and PMI Defendants for investment securities. Thus, Plaintiffs' breach of fiduciary duty claim is not barred by the Florida economic loss rule.

█ In Count II, Plaintiffs allege that Defendants converted millions of dollars of Plaintiffs' money for Defendants' personal and business use. *See* Plaintiffs' Compl. (Doc. 1) ¶ 88. at 19. Count [ ] is brought against all Defendants. The Third District Court of Appeals "has consistently held that the economic loss rule does not preclude independent tort claims that fall outside the scope of a breach of contract." *Pershing Industries, Inc. v. Estate of Sanz*, 740 So.2d 1246, 1248 (1999) (citing *Alex Hofrichter, P.A. v. Zuckerman & Venditti. P.A.*, 710 So.2d 127 (1998)(where the defendant, by intentional misconduct, converted the plaintiff's property to his own use, this was more than a claim for a simple breach of contract and actions for conversion and civil theft were not barred by the economic loss rule). *rev. denied*, 728 So.2d 206 (1998); *Estuardo v. Hasbun*, 689 So.2d 1144 (Fla. 3d DCA 1997)).

Further, the First District Court of Appeal held that where the defendant's acts were " 'not merely a failure to perform, but an affirmative and intentional act of converting the funds to his own use by allegedly stealing the monies to which he was entrusted, there is not merely a breach of contract but a separate and independent tort.' " *Id.* (quoting *Burke v. Napieracz*, 674 So.2d 756, 758 (1996)); *see also Ishii v. Welty*, 1998 WL 1064846, at *9 (M.D.Fla.1998) (the plaintiff alleged independent acts in a conversion claim that

were separate from any direct bank-customer agreement between the parties, and that such a claim for conversion is not barred by the economic loss rule); *Lajos v. duPont Publishing, Inc.*, 888 F.Supp. 143, 145–46 (M.D.Fla.1995) (illustrator's conversion claim against publisher was not barred by the economic loss rule as illustrator alleged that publisher's retention and reproduction of artwork of illustrator without permission was independent of publisher's rights or obligations under production and licensing agreement). Pursuant to the above case law, Plaintiff's claim of conversion is not barred by the Florida economic loss rule.

█ In Count III, Plaintiffs allege that PMI Defendants were negligent in the manner PMI Defendants invested Plaintiffs' funds and in the manner PMI Defendants allowed others to use Plaintiffs funds. *See* Plaintiffs' Compl. (Doc. 1) ¶ 99, at 21. PMI Defendants consist of Black, Franklin, Twitty, Adams, PMI, PMC, and PE. *See id.* ¶ 15, at 4. To state a cause of action for negligence, the plaintiff must allege the existence of a legal duty on the part of the defendant to protect the plaintiff from injury, the failure of the defendant to perform this duty, and that the injury or damage to the plaintiff resulted from such failure. *See Moransais v. Heathman*, 744 So.2d 973, 976 n. 3 (1999) (citing 38 Fla. Jur.2d Negligence § 156 (1998)). As a general rule, bodily injury or property damage is an essential element of a cause of action for negligence. *See Monroe v. Sarasota County School Bd.*, 746 So.2d 530, 531 (1999).

Count III appears to be a claim in the alternative. Plaintiffs appear to allege that if PMI Defendants did not intentionally act to defraud Plaintiffs, then PMI Defendants acted negligently by failing to perform any *bona fide* due diligence in researching the Cash 4 Titles promissory notes. *See* Plaintiffs Compl. (Doc. 1) ¶ 99(b), at 21. However, Plaintiffs include in their negligence claim certain actions that could only be intentional, such as PMI

Defendants' statements that they had no financial interest in the Cash 4 Title scheme and selling BAOA stock to Plaintiffs. If PMI Defendants had a financial interest in the Cash 4 Title scheme and lied about their interest to Plaintiffs, then PMI Defendants committed an intentional act rather than a negligent one. Further, Plaintiffs have alleged that PMI Defendants knowingly received the BAOA stock and sold it to Plaintiffs when the stock was supposed to be in exchange for the Plaintiffs' endorsement of the BAOA board game; therefore, PMI Defendants allegedly acted intentionally not negligently. *See id.* ¶ 37, at 9. Thus, Plaintiffs shall amend their complaint to allege proper negligence claims and specify which Defendants performed negligent acts. *See* Fed.R.Civ.P. 15(a). Some of Plaintiffs claims may be more appropriately alleged under fraudulent inducement and/or negligent misrepresentation.

■ *Moransais* specifically provides that the economic loss rule does not bar negligence actions for purely economic losses involving a special relationship between a professional and third parties who might be affected by the professional's negligent acts. *See Moransais,* 744 So.2d at 982. In actions for professional malpractice, contractual privity between the professional and the injured party is not required. *See id.* at 977 n. 5. Plaintiffs have not alleged that PMI Defendants should be held to the standard of professionals. *See id.* at 976 (citing section 95.11(4)(a), Florida Statutes, which provides that a profession is any vocation requiring a four-year college degree before licensing is possible in Florida).

■ Further, a plaintiff may recover purely economic losses arising from a misrepresentation that is made in a negligent manner. *See Monroe,* 746 So.2d at 537 (citing *First Florida Bank v. Max Mitchell & Co.,* 558 So.2d 9 (Fla.1990); *Gilchrist Timber Co. v. ITT Rayonier, Inc.,* 696 So.2d 334 (1997); Restatement (Second) of Torts § 552 (1977)); *Moransais,* 744 So.2d

at 982. Section 552 of the Restatement (Second) of Torts is a narrow exception to the economic loss rule that provides as follows:

Information Negligently Supplied for the Guidance of Others

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered (a) by the person or one of a group of persons whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in substantially similar transaction.

*See Russell v. Sherwin–Williams Co.,* 767 So.2d 592 (Fla. 4th DCA 2000) (citing *Bay Garden Manor Condominium Ass'n v. Marks Associates,* 576 So.2d 744 (1991); *First State Savings Bank v. Albright & Assoc., of Ocala,* 561 So.2d 1326 (Fla. 5th DCA), *review denied,* 576 So.2d 284 (Fla. 1990)). Thus, a claim of negligence is not necessarily barred by the Florida economic loss rule. However, Plaintiffs should amend their complaint to properly allege a cause of action for negligence.

■ In Count IV, Plaintiffs allege that PMI Defendants entered into a conspiracy to misappropriate principal and interest from Plaintiffs through the BAOA scheme. *See* Plaintiffs' Compl. (Doc. 1) ¶ 104, at 22. PMI Defendants consist of Black, Franklin, Twitty. Adams, PMI,

PMC, and PE. *See id.* ¶ 15, at 4. The First District Court of Appeals held that a properly stated claim for civil conspiracy is not barred by the economic loss rule. *See Ron's Quality Towing, Inc. v. Southeastern Bank of Florida,* 765 So.2d 134, 136 (2000) (the plaintiff towing company alleged that the defendant bank conspired with competitor of the plaintiff to delay repairs to the defendant's tow truck in order to force the plaintiff into insolvency) (citing *Moransais,* 744 So.2d at 979–83); *see also Invo Florida Inc. v. Somerset Venturer, Inc.,* 751 So.2d 1263, 1266 n. 1 & 1268 (2000) ("The elements required for conspiracy to effect fraudulent transfer ... are different from the breach of contract elements," and Third District Court reversed summary judgment on civil conspiracy claim since claim was not barred by the Florida economic loss rule.). A claim for civil conspiracy is properly stated when a plaintiff demonstrates that the conspirators possessed some peculiar power of coercion by virtue of their combination, a power that an individual would not possess, and that the conspirators had the malicious purpose to harm the plaintiff. *See Gould v. Sacred Heart of Pensacola,* 1998 WL 995313, at *12–13 (N.D.Fla.1998); *Churruca v. Miami Jai–Alai, Inc.,* 353 So.2d 547, 549–50 (Fla.1977) (rehearing denied); *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla.,* 667 So.2d 876, 879 (1996). Thus, Plaintiffs' claim for civil conspiracy is not barred by the Florida economic loss rule.

In Count V, Plaintiffs allege that Defendants entered into a conspiracy to misappropriate principal and interest from Plaintiffs through the Cash 4 Title scheme. *See* Plaintiffs Compl. (Doc. 1) ¶¶ 109–10, at 23–24. In Plaintiffs' Complaint (Doc. 1). Count V appears to be brought against Cash 4 Title Defendants, consisting of Roof, Ellenburg, R & E, Homa, and Cash 4 Titles, Inc. *See id.* at 23. However, Plaintiffs demand an award against PMI Defendants. *See id.* at 24. Thus, Plaintiffs shall amend their complaint to precisely designate which Defendants Count V is brought against. *See* Fed.R.Civ.P. 15(a). To reiterate, the First District Court of Appeals held that a properly stated claim for civil conspiracy is not barred by the economic loss rule. *See Ron's Quality Towing,* 765 So.2d 134, 136 (citing *Moransais,* 744 So.2d at 979–83); *see also Invo Florida Inc.,* 751 So.2d at 1266 n. 1 & 1268.

### B. *Count VI*

In Count VI, Plaintiffs allege that all Defendants violated provisions of the Florida Blue Sky Securities and Investor Protection Act. *See* Plaintiffs' Compl. (Doc. 1) ¶¶ 113–19, at 24–25. Plaintiffs allege that Defendants violated section 517.12, Florida Statutes, which prohibits any person from selling or offering to sell securities in or from offices in this state, or from selling securities to Florida residents from outside the state, by mail or otherwise, unless the person has been registered as a broker/dealer with the Florida Department of Banking and Finance. *See* Plaintiffs' Compl. (Doc. 1) ¶ 114, at 24. Plaintiffs allege that Defendants did not register the BAOA stocks and Cash 4 Title promissory notes with the Florida Department of Banking and Finance and that Defendants did not provide a prospectus of these securities as required by section 517.07, Florida Statutes.[2] *See* Plaintiffs' Compl. (Doc. 1) ¶ 117, at 25.

Plaintiffs further allege that Plaintiffs are entitled to remedies pursuant to section 517.211, Florida Statutes, since PMI Defendants sold shares of stock in BAOA to Plaintiff Hilliard and other PMI clients residing in Florida and since PMI Defendants solicited funds from Plaintiffs and others in Florida to purchase promissory notes that were to be invested in

---

**2.** Plaintiffs contend that the sale of BAOA and Cash 4 Titles securities are not exempt transactions pursuant to section 517.061, Florida

Statutes. *See* Plaintiffs' Compl. (Doc. 1) ¶ 118, at 25.

Cash 4 Titles, Inc., and other entities in the car title loan industry. *See* Plaintiffs' Compl. (Doc. 1) ¶ 116, at 25. Defendants move that Count VI fails to state a claim under Florida's Blue Sky Securities and Investor Protection Act ("SIPA") because Plaintiffs' claim regarding BAOA is barred by a two year statute of limitations and that Plaintiff's claim regarding Cash 4 Titles fails to allege buyer/seller privity as required. *See* Def. Motion to Dismiss (Doc. 4) at 7.

Section 517.301, Florida Statutes, provides that any action for a violation of chapter 517, Florida Statutes, that commences five years from the date of the violation is barred regardless of whether the facts giving rise to the cause of action were known by the plaintiff. *See Medalie v. FSC Securities Corp.*, 87 F.Supp.2d 1295, 1298 (S.D.Fla.2000). At the earliest, Plaintiffs purchased BAOA securities in 1996, and Plaintiffs' commenced this action in 2000, which is still within the five year statute of limitations. *See* Plaintiffs' Compl. (Doc. 1) ¶ 32, at 8.

■ Additionally, Plaintiffs alleges that Defendants Black and PMI actively solicited the sale of Cash 4 Titles securities to Plaintiffs. *See* Plaintiffs' Compl. (Doc. 1) ¶ 52, at 12 (Defendants' statements regarding the safety and lucrative nature of the investment; that funds would be used for growth and expansion of Cash 4 Titles, Inc.; and that Defendants had no financial interest in the investment). The definition of "seller" under section 517.211. Florida Statutes, has been expanded to include those who solicit the sale of securities. *See Beltram v. Shackleford, Farrior, Stallings & Evans*, 725 F.Supp. 499, 500 (M.D.Fla.1989) (defendant may be liable under section 517.211, Florida Statutes, if the defendant solicits the sale of securities); *In re Sahlen & Assoc.*, 773 F.Supp. 342, 372 n. 40 (S.D.Fla.1991) ("this Court determines that conduct sufficient to constitute solicitation for the purposes of satisfying § 517.211 liability is similar to that deemed sufficient by the Supreme Court in

*Pinter v. Dahl* to hold one liable as a 'seller' under § 12(2) of the Securities Act of 1933").

In interpreting the meaning of "solicits" in the context of section 517.211, Florida Statutes, courts have looked to the United States Supreme Court's decision in *Pinter v. Dahl*, 486 U.S. 622, 647, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) in which the Supreme Court provided that a seller under sections 12(1) and 12(2) of the 1933 Securities and Exchange Act may be one who solicits the purchase of a security and that "solicits" includes one who is "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." Thus, Plaintiffs' have sufficiently alleged that Defendants were soliciting the sale of Cash 4 Title securities and that buyer/seller privity was present.

### C. *Count VII*

Count VII of the Plaintiffs' Complaint (Doc. 1) includes claims for violation of the following: (1) Section 17(a) of the Securities Act of 1933; (2) Section 15(c) of the Securities Act of 1934; (3) Section 206(1) of the Investment Advisers Act of 1940; and (4) Section 206(2) of the Investment Advisers Act of 1940. Plaintiffs concede that no private right of action exists for these claims, and Plaintiff's no longer intend to pursue them. *See* Plaintiffs' Response to Defendants' Motion to Dismiss (Doc. 21), at 18 n. 4. Plaintiffs' shall amend their complaint to reflect that these claims will not be pursued. *See* Fed. R. Civ. Pro. 15(a). Plaintiffs continue to assert a violation of section 10(b) of the Securities and Exchange Act of 1934, which prohibits fraudulent conduct in connection with the offer, sale or purchase of securities. *See* Plaintiffs' Response to Defendants' Motion to Dismiss (Doc. 21), at 18. Count VII is brought against PMI Defendants, consisting of Black, Franklin. Twitty, Adams. PMI. PMC, and PE. *See* Plaintiffs' Compl. (Doc. 1) ¶ 15, at 4.

■ Defendants Black and PMI, Inc. move that Plaintiffs failed to satisfy the

pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") that amended section 10(b) of the Securities and Exchange Act of 1934. *See* Defendants' Motion to Dismiss (Doc. 4), at 3. Defendants assert that Plaintiffs failed to allege specific facts to meet the scienter requirement of severe recklessness as required by PSLRA. *See* Defendants' Motion to Dismiss (Doc. 4), at 9–10.

 To allege securities fraud under Rule 10b–5, a plaintiff must demonstrate the following: (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which the plaintiff relied, (5) that proximately caused the plaintiff's injury. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (1999). The Eleventh Circuit adheres to the rule that a showing of "severe recklessness" satisfies the scienter requirement. *See id.* at 1282 (citing *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir.1989)). A complaint must allege with particularity that a defendant acted with a severely reckless state of mind to state a claim for civil liability under Rule 10b–5. *See id.* at 1283. Plaintiffs have alleged sufficient facts to support the scienter requirement of Rule 10b–5. *See* Plaintiff's Complaint (Doc. 1) ¶ 37, at 9 (Defendants sold BAOA stock, which the Defendants had received for free, to Plaintiff Hilliard at inflated prices); ¶ 39, at 9 (Defendant Black directed that $1 million from the sale of BAOA stock be directed to his personal bank account); ¶ 52, at 12 (Defendants made several misstatements of material fact to induce Plaintiffs to invest in Cash 4 Titles securities); ¶ 55, at 12–13 (Defendants entered into an agreement that allowed them to divert 40 percent of Plaintiffs' interest proceeds for themselves).

## 2. *Defendants Black and PMI, Inc.'s Motion for Clarification Regarding Submission of Initial Scheduling Order* (Doc. 18)

Defendants Black and PMI, Inc. request a stay of discovery proceedings, including Fed.R.Civ.P. 26 initial disclosures, pending judgment on motions to dismiss, pursuant to the PSLRA, 15 U.S.C. § 78u–4(b)(3)(B). The PSLRA provides as follows:

> In any private action arising under this chapter, all discovery and other proceedings shall be stayed until the pendency of any motion to dismiss, unless the court finds upon motion of any of party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

*See* 15 U.S.C. § 78u–4(b)(3)(B); *see also Medhekar v. United States*, 99 F.3d 325, 328 (9th Cir.1996) (providing that Fed.R.Civ.P. 26 initial disclosures are a subset of discover and are included in the PSLRA's stay provision). Defendants Black and PMI, Inc.'s Motion for Clarification Regarding Submission of Initial Scheduling Order (Doc. 18) is GRANTED. All discovery and other proceedings in this matter, including those set forth in the Initial Scheduling Order are stayed pending the resolution of all motions to dismiss. At this time two motions to dismiss have been filed (Doc. 4 and Doc. 30).

## 3. *Plaintiffs' Motion for Enlargement of Deadlines Established by the Court's Initial Scheduling Order* (Doc. 23)

Plaintiffs' Motion for Enlargement of Deadlines Established by the Court's Initial Scheduling Order (Doc. 23) is GRANTED. The Court will modify its Initial Scheduling Order so that all deadlines are established in the same manner in which they were originally determined, only that the event from which all deadlines are established is this Court's resolution of all motions to dismiss. At this time, two motions to dismiss have been filed (Docs. 4 and 30).

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1. Defendants Black and PMI, Inc.'s Motion to Dismiss (Doc. 4) is DENIED.

Plaintiffs shall amend counts III, V, and VII of their complaint, pursuant to Fed. R.Civ.P. 15(a), as directed in the body of this Order.

2. Defendants Black and PMI, Inc.'s Motion for Clarification Regarding Submission of Initial Scheduling Order (Doc. 18) is GRANTED. All discovery and other proceedings in this matter, including those set forth in the Initial Scheduling Order are stayed pending the resolution all motions to dismiss pursuant to section 21D(b)(3)(B) of the PSLRA. At this time, two motions to dismiss have been filed (Docs. 4 and 30).

3. Plaintiffs' Motion for Enlargement of Deadlines Established by the Court's Initial Scheduling Order (Doc. 23) is GRANTED. The Court will modify its Initial Scheduling Order so that all deadlines are established in the same manner in which they were originally determined, only that the event from which all deadlines are established is this Court's resolution of all motions to dismiss. At this time, two motions to dismiss have been filed (Docs. 4 and 30).