In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3332

COEXIST FOUNDATION, INC.,

*Plaintiff-Appellee,*

*v.*

MICHAEL FEHRENBACHER, *et al.*,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cv-06279 — **Sharon Johnson Coleman**, *Judge.*

ARGUED MARCH 29, 2017 — DECIDED AUGUST 2, 2017

Before WOOD, *Chief Judge,* and ROVNER and WILLIAMS,
*Circuit Judges.*

ROVNER, *Circuit Judge.* This case involves the unfortunate
meeting of a hapless retired baseball player seeking to invest
his earnings, a self-described "con man" who claims to be
reformed, persons running a Ponzi scheme, and a man who
"had no business handling the investment finances of others."
*Coexist Foundation, Inc. v. Fehrenbacher*, 2016 WL 4091623, *4

(N.D. Ill. Aug. 2, 2016). The con man is the plaintiff, and it is doubtful that he is truly reformed. The man who had no business handling the investments of others is the primary defendant. The Ponzi scheme was run by a Florida company called Assured Capital, which is not a party to this suit. The person who lost everything is, of course, the unlucky baseball player, whose father was attempting to manage his son's finances when he fell victim to the scheme here. After a bench trial, the district court determined that the defendants violated a Florida law prohibiting the sale of unregistered securities. The court ordered rescission in the hopes that some of the money would get back to the baseball player, who had obtained a judgment against the con man in separate litigation. The defendants now appeal and we affirm.

## I.

Coexist Foundation, Inc. was formed in 2008 by Timothy Hubman, an admitted con man who created Coexist after he was forced to dissolve his former "Hubman Foundation." A federal court in Virginia had determined that the Hubman Foundation was not a charity but a sham designed to insulate Hubman from his debts and obligations. That court also found that Hubman and his former foundation had engaged in "fraudulent conduct, intentional deceptive and misleading actions, and outright lies" as part of an ongoing pattern of misconduct extending over many years and across several states. R. 217, at 59. Hubman, who claimed to be reformed after joining a church, became the president and sole director of the Coexist Foundation on the very day he dissolved the fraudulent Hubman Foundation. Hubman was introduced to Michael Fehrenbacher, a defendant here, by a "mutual contact" in early

2009. Fehrenbacher was the president of MWF Financial, a wholesale banking institution that packaged and sold mortgage notes to investment banks, and of United Funding, a retail loan broker. Fehrenbacher was interested in meeting Hubman because Hubman claimed to have contacts who could be potential clients for Fehrenbacher.

Hubman's first potential contact for Fehrenbacher did not pan out but on March 31, 2009, Fehrenbacher offered Hubman a deal via email that promised any invested funds would not be at risk and would be held in escrow. In April 2009, Coexist wired $300,000 to Fehrenbacher's account at Harris Bank in Illinois.[1] Soon thereafter, Hubman requested a return of $150,000 and Fehrenbacher complied. An email trail documented what happened next. On June 3, Fehrenbacher sent Hubman an email stating that "the trader" confirmed a "placement" of the remaining $150,000 that would produce a twenty-five percent return every ten days. Coexist would receive fifteen percent of that return. Fehrenbacher told Hubman in the email that, if he wired an additional $1.85 million, Fehrenbacher would combine it with the $150,000, securing a return of thirty percent, as well as a weekly payout. In a June 5 email, Fehrenbacher attempted to clarify the deal with Hubman:

---

[1] Fehrenbacher ran several businesses, including United Funding and MWF Financial. The accounts at Harris Bank through which the money flowed for this deal were titled in the names of Fehrenbacher's business ventures. The name appearing most often on the banking exhibits received at trial is that of United Funding. One document from Fehrenbacher instructing Hubman on a wire transfer directs Hubman to send the funds to "MWF Financial, aka United Funding, Inc." R. 216, at 42.

Trade starts Monday and will pay 30% every 2 weeks. It will pay 15% for the first week, as its only half the trading time.

My current 2M is going to pay 30% bi-weekly. The trade starts Monday and we will be paid 15% next Friday. I will pay you half of the 15% as we agreed to split it.

Now, When I place your funds (2M) next week, the following Monday your platform will be eligible for a weekly trade. It is my current understanding it will pay between 25–30% per week, odds are 30. So your 2M will go into a weekly slot. I will then pay you weekly.

…

Next, part of the compensation I want you to consider, is a couple of domestic flights for me and my family (4 in total) from Dupage. two flights are two florida (nov 09, spring break 2010), one is to Hawaii (dec 2009—right after xmas), and one is to vegas (3—4 weeks down the road), I ask that these flights are paid out of your dividends you are paid. I would also like to be considered to use the plane for a couple of business flights—that i will pay for, but you can provide me the contact to set it up.

R. 216, at 44 (all errors in original).

Coexist subsequently wired an additional $1.85 million to Fehrenbacher who then transferred the entire $2 million ($150,000 plus $1.85 million) to a Florida company called

Assured Capital, the "trader" referenced in the emails. In a June 24 email, Fehrenbacher sent to Hubman two "Joint Venture Agreements," one addressing the initial $150,000 transfer and the other related to the $1.85 million transfer from Hubman. The identical agreements provided that Fehrenbacher wished to invest a portion of Coexist's funds in "a program," and that the money would be placed in escrow where it would remain under control of the escrow agent. The agreements purported that the money would not be at risk and would be used only as proof of funds. The investment would pay thirty percent bi-weekly until December 2009. Hubman signed the paperwork at Fehrenbacher's Illinois office but never received fully executed copies signed by Fehrenbacher. Fehrenbacher denied that he ever signed the agreements. Fehrenbacher also asserted that he never received any compensation from Hubman, claiming that the "splitting" of the profits was with Assured Capital, that the flights never materialized, and that he arranged the deal for Hubman solely in the hopes of earning money from contacts referred to him by Hubman.

The deal sounded too good to be true, and it was. After Fehrenbacher invested with Assured Capital the $2 million he received from Coexist, as well as $2.8 million of his own money, he discovered that Assured Capital was running a Ponzi scheme. He complained to the FBI and filed a civil suit against Assured Capital, its officers and its affiliates. He obtained a default judgment against one defendant and settled with the others. Assured ultimately paid him $4.3 million out of the $4.8 million that he invested. Fehrenbacher then re-

turned $1,494,250 to Coexist, an amount that he calculated to be the Foundation's *pro rata* share of the recovery, less costs.

The $2 million that Coexist "invested" in Fehrenbacher's "program" was actually the money of Shannon Stewart, a retired professional baseball player, and his father, Harold Stewart, who managed his son's finances. Hubman told the Stewarts that Coexist was a charitable foundation and he solicited from the Stewarts a "conditional donation" to Coexist that Hubman told them would be returned within a few months. Hubman never returned the money and the Stewarts subsequently obtained a judgment for $2 million against Hubman and Coexist. But as of the time of the bench trial in the instant case, Hubman had paid not one penny back to the Stewarts even though he had recovered more than $1.4 million of the Stewarts' money from Fehrenbacher.

Coexist filed an eleven count complaint against Fehrenbacher and his companies, United Funding, Inc. and MWF Financial & Mortgage Center, Inc. d/b/a Midwest Funding Bancorp, Inc. The court disposed of five counts in pre-trial proceedings and held a bench trial on the remaining claims for breach of contract, civil theft, fraudulent transfer of assets, and violations of Florida securities laws. The court found in favor of Coexist on its claim for the sale of unregistered securities in violation of Florida Statute § 517.07, and granted Fehrenbacher's motion for a directed verdict on all of the remaining counts. The court concluded that it was appropriate to "undo the investment transaction with Coexist via the remedy of rescission." *Coexist*, 2016 WL 4091623, at *4. Fehrenbacher had already returned $1,494,250 to Coexist, so the court calculated the damages by adding the outstanding

investment price owed, $505,750, to the interest accrued to date, $189,521.40, for a total of $695,271.40. Fehrenbacher appeals.

## II.

On appeal, Fehrenbacher argues that the allegations of the unregistered securities count were not proven. In particular, he asserts that there was no evidence regarding a "security" or a sale of a security; that no scheme or transaction took place in Florida as required by the statute; that Fehrenbacher received no consideration for the deal; that judgment should not have been granted against all defendants; and that the doctrine of unclean hands should have been applied to deprive Coexist of any recovery. Fehrenbacher characterizes his argument as one of statutory interpretation and contends that the standard of review for all issues is therefore *de novo*. Although we agree that issues of law are reviewed *de novo*, it is clear from the content of Fehrenbacher's argument that he is mainly challenging the sufficiency of the evidence presented to the district court on this count. After a bench trial, we review the district court's factual findings for clear error and its conclusions of law *de novo*. Fed. R. Civ. P. 52(a)(6); *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 295–96 (7th Cir. 2011). Additionally, we must give "due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P 52(a)(6).

The Florida statute at issue provides, in relevant part:

> It is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state unless the security is exempt under § 517.051, is sold in a transaction exempt under § 517.061, is a

federal covered security, or is registered pursuant to
this chapter.

Fla. Stat. § 517.07. The statute defines a sale as "any contract of sale or disposition of any investment, security, or interest in a security, for value." Florida Stat. § 517.021. "Security" is defined broadly to include, among other things: a note; a stock; an investment contract; a beneficial interest in title to property, profits, or earnings; or an interest in or under a profit-sharing or participation agreement or scheme. Florida Stat. § 517.021.

Fehrenbacher first contends that there was "no evidence regarding the definition of a security or why these transactions would constitute such a sale." But as we have just noted, the statute, not the evidence, supplies the definition of a "security" and a "sale." The evidence presented at trial easily supports the finding that the scheme here involved a "sale" of a "security." Fehrenbacher's emails and the parties' actions evidenced an agreement for Coexist to provide two million dollars to Fehrenbacher so that Fehrenbacher could invest it with Assured Capital, the trader referenced in the emails. The deal was to provide a high rate of return—a profit—that would be shared by the parties to the transaction. The deal was thus for "an investment contract" or in the very least for "an interest in or under a profit-sharing or participation agreement or scheme," and Fehrenbacher was to receive something of value

in exchange for arranging the investment.[2] The evidence thus fits those statutory definitions precisely.

In determining that there was a sale of unregistered securities, the district court relied in part on Fehrenbacher's allegations in his civil suit against Assured Capital, finding those allegations to be evidentiary admissions. Fehrenbacher complains that the district court improperly relied on his complaint against Assured Capital without giving him an opportunity to rebut his earlier allegations. Fehrenbacher had alleged in his case against Assured Capital that the transaction at issue here was a sale of an unregistered security, an allegation that directly contradicts his claim in this case that there was no sale of an unregistered security. The district court properly construed that allegation as a non-binding evidentiary admission. *Higgins v. Mississippi*, 217 F.3d 951, 955 (7th Cir. 2000). Although Fehrenbacher now complains that the court gave him no opportunity to rebut the allegations he made in the earlier suit, he does not question the authenticity of the statements he made in the earlier proceeding or offer any

---

[2] Fehrenbacher asserts that he received nothing of value in exchange for setting up the deal between Coexist and Assured Capital. The documentary evidence admitted at trial belies that claim. According to his own emails, Fehrenbacher expected to receive a percentage of the profits, rides on Hubman's private jet, and future business from Hubman's associates. That Hubman had no jet and no profits or future business materialized is irrelevant. Fehrenbacher expected to receive something of value in exchange for his efforts. Under Florida law, that is enough. *See Hilliard v. Black*, 125 F.Supp.2d 1071, 1083 (N.D. Fla. 2000) (noting that a seller includes a person who solicits a sale of a security and is motivated at least in part by a desire to serve his own financial interests).

explanation for the apparent contradiction. As in *Higgins*, the court was therefore right to credit the statement made in the prior lawsuit and disregard the later, contrary statement. 217 F.3d at 955. Although the court should have notified Fehrenbacher of its intent to rely on the statements he made in the earlier lawsuit and offered him an opportunity for rebuttal, any error in relying on those allegations is harmless in light of Fehrenbacher's failure to challenge on appeal the truth of his earlier allegations.

Fehrenbacher also asserts that when the district court dismissed certain other counts related to conspiracy and fraud, that dismissal conclusively determined that there was no contract or scheme. He also points out that the district court rejected breach of contract claims for an escrow disbursement agreement signed by the parties and the Joint Venture Agreements. But there is nothing about the rejection of the other counts that precludes the court's findings on this count. That those particular documents were not enforceable contracts has no bearing on whether the investment scheme at issue meets the statutory definition of a sale of an unregistered security.

Fehrenbacher complains that there was no evidence that the sale took place in Florida, as required by the statute. This is an odd objection given that Fehrenbacher himself sued Assured Capital, a Florida company, in federal court in the Middle District of Florida, for this very sale of an unregistered security. Indeed, he recovered $4.3 million as a result of that suit. In any case, the record contains plenty of evidence tying the transaction to Florida. Hubman was a citizen of Florida at the time of the transactions. Coexist is a Florida corporation, as is Assured Capital. Only Fehrenbacher and his companies are in Illinois.

After receiving the money from Hubman, Fehrenbacher wired the funds to Assured Capital in Florida so that the company could commence trading and return the profits to Hubman in Florida and Fehrenbacher in Illinois. That is sufficient to demonstrate that the sale of the security took place in Florida.

Fehrenbacher next asserts that he could not be the "seller" of the unregistered security because he was himself a victim of Assured Capital's Ponzi scheme. But the evidence at trial demonstrated that Fehrenbacher acted as an agent for Coexist and Hubman in arranging Coexist's investment in Assured Capital's "program," which of course turned out to be a Ponzi scheme. That Fehrenbacher himself was also taken in by the scheme and lost some of his own money in the deal does not relieve him of responsibility for acting as an agent for Coexist in setting up the transaction. Fehrenbacher argues that Hubman should be "presumed not to be credible" based on his multiple felony convictions. The district court, which was well aware of Hubman's background, appears to have credited Hubman's testimony only to the extent that it was corroborated by documentary evidence. In any case, we defer to the district court's findings on credibility unless clearly erroneous, and there is no error here. Fed. R. Civ. P. 52(a)(6); *Mathin v. Kerry*, 782 F.3d 804, 809–10 (7th Cir. 2015).

Fehrenbacher complains that the judgment should not have been entered against United Funding, MWF Financial or any of his corporate affiliates because there was no evidence of their involvement in the sale. But the emails presented to the trial court and Fehrenbacher's own testimony demonstrated conclusively that Fehrenbacher's companies were involved in every exchange of funds that took place here. The bank

accounts used in the transaction were titled "United Funding, Inc. DBA MWF Financial DBA Midwest Funding." R. 216, at 32. The wiring instructions that Fehrenbacher sent to Hubman directed Hubman to send the money to a Harris Bank account titled "MWF Financial aka United Funding." R. 216, at 42. When Fehrenbacher sued Assured Capital for the transaction, the named plaintiffs were United Funding, Inc. and Fehrenbacher himself. When Fehrenbacher returned some of the original $2 million investment to Coexist, the funds were wired from United Funding to Coexist. *See* R. 203, at 26–27 (where Fehrenbacher testified that the wire to Coexist "wasn't sent from me personally," but rather was from one of his entities, namely United Funding, MWF or Midwest Funding). This unimpeached evidence was more than adequate to prove that the companies participated in the transactions at issue.

Finally, Fehrenbacher contends that the district court erred when it declined to apply the doctrine of unclean hands to deprive Coexist of any recovery. The district court found that, under both Florida and Illinois law, the doctrine applies only when the plaintiff's fraudulent conduct is directed at the party invoking the doctrine as a defense. *See Long v. Kemper Life Ins. Co.*, 553 N.E.2d 439, 441 (Ill. App. Ct. 1990); *McCollem v. Chidnese*, 832 So.2d 194, 196 (Fla. Dist. Ct. App. 2002). In general, the doctrine of unclean hands precludes a party from taking advantage of his own wrong. *Long*, 553 N.E.2d at 441. "The doctrine applies if the party seeking equitable relief is guilty of misconduct, fraud or bad faith toward the party against whom relief is sought if that misconduct is connected with the transaction at issue." *Long*, 553 N.E.2d at 441. *See also McCollem*, 832 So.2d at 196 ("The fact that a party's conduct is

disreputable is entirely irrelevant where the party asserting unclean hands is not the target of, and has taken no action in reliance on that conduct, however disdainful of that conduct a court may be."). As the court noted, Fehrenbacher was not the victim of Hubman's conduct, but sought to have the court rely on Hubman's conduct towards the Stewarts as a reason for denying relief to Coexist. The doctrine of unclean hands simply does not apply to this situation. Hubman did not behave in a fraudulent manner toward Fehrenbacher; instead he has engaged in wrongful conduct toward the Stewarts, who have a judgment against him for that conduct.

Moreover, in assessing the defense of unclean hands, the district court noted:

> Fehrenbacher had no business handling the investment finances of others. His representations to Coexist about their joint venture [were] riddled with telltale markers of a fraudulent investment scheme: promises that the scheme is both risk free and high-yield, vague references to a trading platform, use of escrow agents to receive and disburse funds, and false claims that the escrow account protects the investor from loss.

*Coexist*, 2016 WL 4091623, *4. The court's ultimate goal was to return the funds to the parties who were truly harmed in this transaction, the Stewarts. We agree with the court's assessment that there "is no reason to believe [that] money in Fehrenbacher's possession is more likely to make its way to the Stewarts than money in Coexist's coffers, from where the Stewarts at least have the possibility of recovering through an

action to enforce the judgment they obtained." *Id*. Absent an abuse of discretion, we will not disturb the trial court's decision regarding the application of the doctrine of unclean hands. *Long*, 553 N.E.2d at 441. There was no abuse of discretion here.

AFFIRMED.